# 13-1416-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆

IN RE COMMODITY EXCHANGE, INC. SILVER FUTURES
AND OPTIONS TRADING LITIGATION

BRIAN J. BEATTY, PETER LASKARIS, SILVER FUTURES, JAMES D. KENSIK, VALERIE KAM, JAMES AKERS, JOHN MURPHY, CLAL FINANCE DERIVATIVES TRADING LTD., CONNOR G. MURPHY, WILLIAM HEARN, ELEANOR CROSSWHITE, THOMAS CROSSWHITE, JEFFREY R. CURRENT, TAMARA CURRENT, ROBERT GOLTERMANN, TODD R. ILIFF, JEFFREY LEWIS, TRUSTEE FOR WILLIAM O. LEWIS AND JACQUELYN J. LEWIS, ARLYN JAMES MILLER, THOMAS MECKEL, LJG ASSET MANAGEMENT, INC., JOHN L. BROADWAY, III, AIS CAPITAL MANAGEMENT, LLC, AIS FUTURES MANAGEMENT, LLC, TERESA CRACRAFT, H. BRAD ANTIN, CONNIE ANTIN, ARTHUR TONELLI, NICHOLIS REPKE, on behalf of himself and all others similarly situated,

*Plaintiffs,*

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## CORRECTED AND AMENDED BRIEF AND SPECIAL APPENDIX OF PLAINTIFFS-APPELLANTS

CHRISTOPHER LOVELL
GARY S. JACOBSON
LOVELL STEWART HALEBIAN
  JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

*Attorneys for Plaintiffs-Appellants
Interim Lead Class Counsel*

(*Counsel continued on inside cover*)

ALAN J. ANTIN, BLACKBRIAR HOLDINGS, LLC, CLAL FINANCE MUTUAL FUND MANAGEMENT, LTD., STEVEN B. CRYSTAL, STEVEN B. CRYSTAL Trustee for the Estate of Norman S. Crystal, CRYSTAL INVESTMENT PARTNERS LLC, CHRISTOPHER DEPAOLI, PAUL FELDMAN, GAMMA TRADERS I, LLC, REBECCA A. HOUGHER, DR. ROBERT HURT, PAUL D. KAPLAN, GORDON KOST, TERESA KUHN, SHAWN KUO, CARL F. LOEB, KEVIN J. MAHER, ERIC NALVEN, J. SCOTT NICHOLSON, ROBERT NEPO, MARLENE STULBACH, KEITH WAGNER, WAYNE W. WILLETZ, VINCENT YACAVINO, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

—against—

JP MORGAN CHASE & CO., JP MORGAN CLEARING CORP., JP MORGAN SECURITIES INC., J.P. MORGAN FUTURES INC., JOHN DOES, 1-10, JOHN DOES, 11-20,

*Defendants-Appellees,*

HSBC HOLDINGS PLC, HSCB SECURITIES (USA) INC., HSBC BANK USA,

*Defendants.*

———————————————

BERNARD PERSKY
ROBINS, KAPLAN, MILLER
  & CIRESI L.L.P.
601 Lexington Avenue, Suite 3400
New York, New York 10022
(212) 980-7400

GEOFFREY HORN
VINCENT BRIGANTI
LOWEY DANNENBERG COHEN
  & HART, P.C.
One North Broadway
White Plains Plaza, 5th Floor
White Plains, New York 10601
(914) 997-0500

WILLIAM BUTTERFIELD
HAUSFELD LLP
1700 K Street N.W., Suite 650
Washington, D.C. 20006
(202) 540-7200

J. DOUGLAS RICHARDS
COHEN MILSTEIN SELLERS
  & TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

*Attorneys for Plaintiffs-Appellants*
*Members, Interim Plaintiffs'*
*Steering Committee*

DAVID KOVEL
KIRBY MCINERNEY LLP
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 317-2300

STEVE W. BERMAN
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292

MICHAEL M. BUCHMAN
POMERANTZ HAUDEK GROSSMAN
  & GROSS LLP
100 Park Avenue, 26th Floor
New York, New York 10017
(212) 661-1100

ROBERT KAPLAN
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, New York 10022
(212) 687-1980

SAMUEL J. LIEBERMAN
SADIS & GOLDBERG LLP
551 Fifth Avenue, 21st Floor
New York, New York 10176
(212) 573-8164

LINDA NUSSBAUM
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

W. JOSEPH BRUCKNER
LOCKRIDGE GRINDAL
  NAUEN P.L.L.P.
100 Washington Avenue South,
  Suite 2200
Minneapolis Minnesota 55401
(612) 339-6900

ROBERT S. SCHACHTER
STEPHEN L. BRODSKY
ZWERLING, SCHACHTER
  & ZWERLING, LLP
41 Madison Avenue
New York, New York 10010
(800) 721-3900

JEFFREY A. KLAFTER
KLAFTER, OLSEN & LESSER, LLP
Two International Drive, Suite 350
Rye Brook, New York 10573
(914) 934-9220

LOUIS F. BURKE
LOUIS F. BURKE P.C.
460 Park Avenue, 21st Floor
New York, New York 10022
(212) 682-1700

BRUCE L. SIMON
GEORGE S. TREVOR
PEARSON SIMON WARSHAW
  PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, California 94104
(415) 433-9000

PEGGY J. WEDGWORTH
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
(212) 594-5300

JEFFREY SQUIRE
BRAGAR WEXLER EAGEL & SQUIRE
885 Third Avenue, Suite 3040
New York, New York 10022
(212) 308-5858

*Additional Plaintiffs' Counsel*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellants certifies that:

Blackbriar Holdings LLC has no parent company, and no publicly held corporation owns 10% or more of its stock.

CLAL Finance Mutual Fund Management, Ltd, now known as Harel Pia Mutual Funds, Ltd., is a wholly-owned subsidiary of Harel Finance Holdings Ltd., which is a wholly-owned subsidiary of Harel Insurance Investments and Financial Services Ltd., a publicly traded corporation on the Tel-Aviv Stock Exchange.

Crystal Investment Partners LLC has no parent company, and no publicly held corporation owns 10% or more of its stock.

Gamma Traders I, LLC has no parent company, and no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

Page

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF ISSUES PRESENTED................................................1

STATEMENT OF THE CASE...............................................................4

    A.  Price Manipulation In Violation of the CEA..............................6

COURSE OF THE PROCEEDINGS BELOW ......................................9

STATEMENT OF FACTS ...................................................................9

    A.    Background ..............................................................9

    B.    The CFTC Report Identifies Five Manipulation Probative
        Factors....................................................................11

    C.    With Full Knowledge Of The CFTC Report, JPMorgan Radically
        Changed Its Conduct, In Each Of The Five Ways From Innocent To
        Manipulative Behavior ........................................................13

        1.    Each One Of JP Morgan's Departures From Standard
            Bullion Dealer Conduct, Tended To Depress Silver Prices .....14

        2.    Thus, From March 17-August 15, 2008 The Five Fold
            Increase In JPMorgan's Short Silver Positions, Caused Silver
            To Plummet By 29.6% While Gold Prices Remains Almost
            Unchanged .................................................................16

        3.    From March 25, Until CFTC Commission Chilton's -October
            27, 2010 Statement, JPMorgan's Silver Concentration Fell By
            One Third And Silver Prices Increased By 40%, Twice As
            Much As Gold..............................................................16

        4.    The 40% Higher Gold-Silver Ratio During The
            Class Period Than Before Was Caused By Defendants'
            Price Suppressing Conduct .......................................18

i

5.  Thus, Not Only Was Each Of Defendants' Departures From Standard Bullion Dealer Conduct Designed To Suppress Silver Prices But The Increasing Or Decreasing Degree Of Such Manipulative Conduct Caused The Increasing Or Decreasing Degree Of Distortion Of Silver Prices ..................20

D.  In Addition To Being Highly Unusual Because It Was Contrary To The Standard Conduct Of Bullion Dealers, JPMorgan's Conduct Was Also Contrary To That Of A Hedger ..........................................21

E.  Consistent With And Corroborating Their Large Position Manipulation, JP Morgan Also Manipulated Prices On Specific Days ..................................................................................................23

F.  Gold Is The Traditional Benchmark For Silver Prices And The Other Potential Benchmarks Were Themselves Manipulated And Otherwise Inappropriate During The Class Period .....................30

G.  STANDARD OF REVIEW ..................................................................33

ARGUMENT ..................................................................................................34

RULE 8(a) PLEADING STANDARD ..................................................................34

A.  Plaintiffs Plausibly Alleged Primary Manipulation ............................34

1.  Plaintiffs Overwhelmingly Alleged The Ability To Influence Element Which Makes Plaintiffs' Pleading Of The Other Three Elements More Plausible ................................................35

2.  In Multiple Independently Sufficient Ways, Plaintiffs Plausibly Alleged That Defendants Intended To Manipulate Silver Futures Prices Between March 17, 2008 And October 27, 2010 ..............................................................35

a.  Motive And Opportunity Or Ability To Suppress Prices ..............................................................................35

b.    Knowledge That Large Positions And Trades Will Impact
And Are Impacting Prices, While Taking Such Large Positions And Making Such Large Trades ....................37

c.    Trading Strategy That Is Highly Unusual Or Even Uneconomic But Accomplishes Its Goal And Becomes Profitable Through Its Impact On Prices ........................38

d.    In The Foregoing Circumstances, The *Anderson* "Less Plausible Inference" Test Applies And Is Satisfied .......41

e.    The Decision Failed To Consider The Totality Of The Circumstances Including Plaintiffs' Most Important Allegations .....................................................................41

f.    The Decision Mistakenly Found That Plaintiffs Alleged That Defendants Were Hedging, And Then Compared This Mistaken Version Of Plaintiffs' Claim To Erroneously High Pleading Requirements .....................42

g.    Contrary To The Decision, The Defendants' Proffered Website Fully Supports The Complaint Rather Than Undercuts It ..................................................................45

3.    Plaintiffs Plausibly Alleged Defendants' Intent To Manipulate On June 26, 2007, August 15, 2008, And Between March 17 And August 15, 2008 ...............................47

4.    Plaintiffs Plausibly Allege The Existence Of Artificial Prices .........................................................................................47

a.    Means of Alleging Artificial Prices ...............................47

b.    The Decision's Multiple Errors Regarding Artificial Prices ..............................................................................47

5.     In Multiple Independently Sufficient Ways, Plaintiffs Plausibly Allege JPMorgan's Causation Of Artificial

iii

        Prices .......................................................................................55

B.    Plaintiffs Plausibly Pleaded A Claim For Aiding And Abetting
    Manipulation ......................................................................59

C.    Plaintiffs Plausibly Alleged Sherman Act Section 1 and 2
    Claims..................................................................................60

        1.    Section 1 Claim.........................................................60

        2.    Section 2 Claim.........................................................61

CONCLUSION .........................................................................................63

# TABLE OF AUTHORITIES

## Cases

*Anderson News, LLC v. American Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)................................................... 33, 41, 54

*Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989)...............................57

*Billing v. Credit Suisse*, 426 F.3d 130 (2d Cir. 2006) ...............................................7

*Blanchard Co., Inc. v. Barrick Gold Corp.*,
   2003 WL 22071173 (E.D. La 2003) ...................................................66

*Board of Trade v. Olsen*, 262 U.S. 1 (1923) ..............................................................6

*Cange v. Stotler & Co., Inc.* 826 F.2d 581 (7th Cir. 1987)......................... 1, 5, 8, 62

*Cargill, Inc. v. Hardin,* 452 F.2d 1154 (8th Cir. 1971) ................................. 6, 7, 57

*CFTC v. Amaranth Advisors, LLC*, 554 F.Supp.2d 523 (S.D.N.Y. 2008) ....... 43, 49

*CFTC v. Brian Hunter*, 07-cv-6682, ECF No. 90 (S.D.N.Y. Jan. 31, 2013) .........40

*CFTC v. Parnon Energy Inc.*, 875 F.Supp.2d 233 (S.D.N.Y. 2012)..................5, 43

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989)..........................................................44

*Credit Suisse Sec. (USA) v. Billing*, 551 U.S. 264 (2007) .........................................7

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2dCir.2010) ........................ 31, 52

*DiPlacido v. CFTC*, 364 Fed. App. 657,
   2009 WL 3326624 (2d Cir. Oct. 16, 2009)................................................ 2, 34, 50

iv

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
   872 F.Supp. 81 (S.D.N.Y. 1995) ........................................................63

*Faulkner v. Beer*, 463 F.3d 130 (2dCir. 2006) ................................. 31, 52

*Galiano v. Fidelity Nat. Title Ins. Co.*,
   2012 WL 2550596 (2d Cir. Jul. 3, 2012)............................................33

*Great Western Food Distrib., Inc. v. Brannan*, 201 F.2d 476 (7th Cir. 1953)........49

*Guttman v. CFTC*, 197 F.3d 33 (2d Cir. 1999)......................................62

*In re Amaranth Nat. Gas Commod. Litig.*,
   587 F.Supp.2d 513 (S.D.N.Y. 2008) ........................................... 35, 44

*In re Anthony J DiPlacido*, CFTC No. 01-23,
   2008 WL 48312 (CFTC Nov. 5, 2008).................................... *passim*

*In re Cox & Frey*, CFTC No. 75-16,
   1987 WL 106879 (CFTC July 15, 1987).................................... 38, 56

*In re Crude Oil Commodity Futures Litig.*,
   2012 WL 6645728 (S.D.N.Y. Dec. 21, 2012) ....................................65

*In re David Henner*, 30 Agric. Dec. 1151 (1971)....................................37

*In re Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep.
   (CCH) ¶ 20,271, at 21,477 (CFTC Feb. 18, 1977) ..............................41

*In re Indiana Farm Bureau Coop. Ass'n Inc.*,
   CFTC No. 75-14 1982 WL 30249 (CFTC Dec. 17, 1982)........................... 41, 56

*In re Kosuga,* 19 Agric. Dec. 603 (U.S.D.A.1960) ..................................57

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
No. 11 MD 2262, 2013 WL 1282338 (S.D.N.Y. Mar. 29, 2013) ......................35

*In re Lincolnwood Commodities*, Comm. Fut. L. Rep. (CCH) ¶ 21,986, at 28,254,
1984 WL 48104 (C.F.T.C. 1984).........................................................................61

*In re Natural Gas Commodity Litig.*,
337 F.Supp.2d 498 (S.D.N.Y. 2004) ...................................................... 39, 47, 61

*In re Platinum and Palladium Commodities Litigation*,
No. 10 Civ. 3617 (S.D.N.Y.) ................................................................................31

*In re Soybean Futures Litig.*, 892 F.Supp. 1025 (N.D. Ill. 1995).................... 34, 57

*In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998)...................... *passim*

*In the Matter of Anthony J. DiPlacido*, CFTC No. 01-23,
2008 WL 4831204 (CFTC Nov. 5, 2008)...............................................................2

*In the Matter of Global Minerals & Metals Corp.*, CFTC Docket No. 99-11, 1999
WL 1023586. .......................................................................................................33

*In the Matter of Moore Capital Management, LP, et al.*,
CFTC Docket No. 10-09 (CFTC April 29, 2010) ................................................31

*Kohen, et al. v. Pacific Investment Management Co. LLC, et al.*,
244 F.R.D. 469, 484 (N.D. Ill. 2007).............................................................. *passim*

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980).................................................. 6, 8, 9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) .....6, 8

*Minpeco v.Hunt*, 718 F.Supp. 168, 173-74 (S.D.N.Y.1989) ...................................57

*Minpeco, S.A. v. Conticommodity Services, Inc.*,
    673 F.Supp. 684 (S.D.N.Y. 1987) .................................................... 16, 50, 51, 52

*Muller-Paisner v. TIAA*, 289 Fed.App'x 461 (2dCir.2008) ...................................46

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ........................................................44

*Polyurethane Foam Litig*, 799 F. Supp. 2d 777 (N.D. Ohio 2011) ........................64

*Rosenthal & Co. v. CFTC*, 802 F.2d 963 (7th Cir. 1986) ........................................62

*Sanner v. Board of Trade of the City of Chicago*, 62 F.3d 918 (7th Cir. 1995) ......64

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) .............................33

*Strobl v. New York Mercantile Exchange*, 768 F.2d 22 (2d Cir. 1985) ...............7, 64

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .................................................65

*Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*,
    738 F. Supp. 1472 (S.D.N.Y. 1990) ........................................................... 57, 64

*U.S. Commodity Futures Trading Comm'n v. Enron Corp.*,
    03-cv-9001, 2004 WL 594752 (S.D. Tex. Mar. 10, 2004) ......................... 34, 43

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*,
    554 F. Supp. 2d 523 (S.D.N.Y. 2008) .................................................................34

*U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
    875 F. Supp. 2d 233 (S.D.N.Y. 2012) .................................................................33

*United States Football League v. National Football League*,
    842 F.2d 1335 (2dCir.1988) ................................................................................57

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ............................................64

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ...............................6

*Wilamowsky v. Take-Two Interactive Software, Inc,*
818 F.Supp.2d 744 (S.D.N.Y. Sep. 30, 2011) ......................................................59

*Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985) ...............64

*Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88 (2dCir.1981)............57

## Other Authorities

Bart Chilton, *Statement at the CFTC Public Meeting on Anti-Manipulation and
Disruptive Trading Practices,* October 26, 2010.................................................18

Conference Report to 1974 Amendment to Congressional Record, 120 Cong.Rec.
34997 (Oct. 10, 1974) ............................................................................................8

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed.)...........54

http://www.lbma.org.uk/pages/printerFriendly.cfm?thisURL=index.cfm&title=mar
ket_guide&page_id=39..........................................................................................45

J. Markham, *Manipulation of Commodity Futures Prices – The Unprosecutable
Crime*, 8 YALE J. ON REG. 281 (1991) ..................................................................7

## STATEMENT OF JURISDICTION

Jurisdiction lies under Section 22 of the CEA, 7 U.S.C. § 25, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1, *et seq.*, 28 U.S.C. §§ 1331 and 1337.  This Court has jurisdiction, 28 U.S.C. § 1291, because the judgment of the District Court, dated March 25, 2013, dismissed with prejudice Plaintiffs' claims and Plaintiffs-Appellants ("Plaintiffs") timely filed their Notice of Appeal pursuant to Fed.R.App.P. 4(a)(1)(A).  Joint Appendix ("JA")-458.  *See* unreported Opinion and Order dated December 21, 2012 ("Decision") Special Appendix ("SPA")-1, a slip copy of which is available on Westlaw at 2012 WL 6700236 (S.D.N.Y.Dec.21, 2012) (dismissing claims); unreported Opinion and Order dated March 18, 2013 ("Decision II") (SPA-42), a slip copy of which is available on Westlaw at 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013)(denying leave to file proposed amended complaint).

## STATEMENT OF ISSUES PRESENTED

"Congress viewed private lawsuits as '**critical** to protecting the public and fundamental to maintaining the credibility of the futures market.'" (Emphasis supplied). ***Cange v. Stotler & Co.,*** 826 F.2d 581, 595 (7th Cir. 1987) ("***Cange***").

In the thirty-plus years since the enactment of the private right to sue for price manipulation under Section 22(a) of the Commodity Exchange Act ("CEA"),

7 U.S.C. § 25(a), this Court has not had occasion to pass on the standards for pleading such claims.

In the foregoing vacuum, the Honorable Court below correctly employed the four-element test for CEA manipulation that this Court approved in the administrative enforcement context and the parties here proposed: "(1) that the accused had the ability to influence market prices; (2) that [she] specifically intended to do so; (3) that artificial prices existed; and (4) that the accused caused the artificial prices." **DiPlacido v. CFTC**, 364 Fed. App. 657, 661, 2009 WL 3326624 at *2 (2d Cir. Oct. 16, 2009)(citations omitted)("**DiPlacido**"), *aff'g* **In the Matter of Anthony J. DiPlacido**, CFTC No. 01-23, 2008 WL 4831204 at *10 (CFTC Nov. 5, 2008) and 2004 WL 2036910 (CFTC Sept. 14, 2004); SPA-18-19.

The Decisions correctly found, as Defendants-Appellees ("Defendants") conceded, that Plaintiffs plausibly alleged the first element of CEA manipulation, ability to influence prices. SPA-19. The Decisions found that Plaintiffs' allegations were consistent with the remaining three elements: manipulative intent, causation and artificial prices. SPA-33-34.

However, in the absence of precedent from this Court, the Decisions repeatedly subjected CEA manipulation claims to pleading requirements that are greater than those for non-CEA manipulation claims.

2

**Issue #1**.  In their complaint (JA-78-181) or amended complaint (JA-246-398), did Plaintiffs plausibly allege a claim for manipulation under Section 22(a) of the CEA, 7 U.S.C. §25(a). Did the Decisions err by effectively:

(a) requiring that internal communications among Defendants must be alleged, in order to plead manipulative intent;

(b) holding that knowledge of moving prices, motive to move, and ability to move prices are not probative of manipulative intent;

(c) requiring that multiple different price benchmarks (including three benchmarks that were being manipulated) must be alleged, in order to plead artificial prices;

(d) holding, after Plaintiffs had amended to allege multiple price benchmarks, that no benchmarks are appropriate to show artificial prices on a one-day manipulation;

(e) finding that any futures contract position that is not challenged by the Commodity Futures Trading Commission ("CFTC") must be exempt from private suit;

(f) making premature fact findings, contrary to Plaintiffs' allegations, based upon judicial notice of an ambiguous entry on a website that, when read in full, actually supported the complaint; and

(g) otherwise repeatedly failing to take Plaintiffs' allegations as true.

3

**Issue #2**.  Did Plaintiffs plausibly allege claims under the Sherman Antitrust Act, 15 U.S.C. §§1, 2?

## STATEMENT OF THE CASE

Plaintiffs respectfully appeal the Fed. R. Civ. P. 12(b)(6) final dismissal of their claims under Section 22(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25(a), and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, against Defendant-Appellees JP Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc., and J.P. Morgan Futures Inc.  (collectively "JPMorgan") for manipulating the prices of silver futures contracts traded on the Commodity Exchange Inc. ("COMEX") in this District on June 26, 2007 and between March 17, 2008 and October 27, 2010 ("Class Period").

The Decisions subjected CEA manipulation claims to erroneously high pleading requirements that do not apply, and that this Court has repeatedly rejected, in non-CEA manipulation contexts.  *See* **Issue#1** (a)-(g) *supra*; Argument *infra*.  These standards would even exempt from substantive liability for CEA manipulation extensive conduct that previously has repeatedly been found to constitute manipulation in violation of the CEA.  *See infra*.

The Decisions' standards and findings would be erroneous under FRCP 12(b)(6) in any other type of case.  They are doubly mistaken in interpreting the CEA.  The CEA is unqualifiedly remedial legislation. ***CFTC v. Parnon Energy***

*Inc.*, 875 F.Supp.2d 233, 243-44 (S.D.N.Y. 2012) (CEA is remedial legislation). Due to the comparatively small budget of the CFTC, Congress depends on the "critical" role of additional private suits to deter violations of the CEA. *Cange*, 826 F.2d at 594-595.

However, the Decisions effectively eliminated any additional deterrence by Section 22(a) additional to that provided by CFTC enforcement actions. The Decisions did so by requiring allegations of internal communications among Defendants in order to plead plausible manipulative intent. But, ordinarily, such internal communications will be available to private plaintiffs only after the CFTC has used its subpoena power to conduct and bring one of the relatively few cases that it does.

In order to accomplish the dual purposes of Section 22(a), the pleading standard must therefore be a practical one. Here, Plaintiffs amply satisfied any practical standard. They alleged that JPMorgan departed from what the CFTC had found to be the four standard common non-manipulative types of conduct by bullion dealers. Each of JPMorgan's departures was the opposite of standard conduct, was manipulative and tended to and did depress silver prices and profit JPMorgan.

JPMorgan allegedly held the largest short position in the COMEX silver futures market from March 17, 2008 through October 27, 2010, constituting 24-

32% of all silver futures in all expirations and 30-40% of the actively traded contracts. JA-115-16,118; ¶¶79,86. This position caused silver prices to be artificially low, leading to a 40% increase in the gold-silver ratio during the Class Period as compared to before. Also, as the amount of JPMorgan's concentration greatly increased, the silver price distortion greatly increased. As the amount of the concentration substantially decreased the distortions substantially decreased.

### B. Price Manipulation In Violation Of The CEA

"Prices are the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226 n. 59 (1940). In the United States, the ever-expanding and still rapidly growing commodity futures markets now accomplish price discovery or set the prices for scores of significant items from silver to interest rates, *e.g*., 7 U.S.C. §1a(9)(defining "commodity").

The three legitimizing purposes of futures trading are (1) price discovery, (2) efficient risk transfer, and (3) price stabilization. *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1156-58 (8th Cir. 1971). Price manipulation destroys all three of these benefits. *Id*.

A commodity futures market "lends itself to manipulation much more readily than a cash market." *Board of Trade v. Olsen*, 262 U.S. 1, 39 (1923). Thus, Congress originally enacted and has since repeatedly strengthened the CEA, 7 U.S.C. §1 *et seq.,* in order to prevent price manipulation. *Leist v. Simplot*, 638

6

F.2d 283, 315 (2d Cir. 1980) ("*Leist*"), *aff'd sub nom. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ("*Curran*").

Part of the enhanced efforts of the amended CEA to prevent and deter price

manipulation was the creation in 1982 of an **express** right of action for civil

plaintiffs under Section 22(a) of the CEA, 7 USC § 25(a).

Further, the CEA, unlike the federal securities laws, prohibits **all** price

manipulation. *Strobl v. New York Mercantile Exchange*, 768 F.2d 22, 28 (2d Cir.

1985) ("a little manipulation" is permitted under the federal securities laws but any

and all manipulation of futures contract prices is prohibited under the CEA);

*Billing v. Credit Suisse*, 426 F.3d 130, 139 (2d Cir. 2006) (same)*, rev'd on other*

*grounds sub nom., Credit Suisse Sec. (USA) v. Billing*, 551 U.S. 264 (2007).

Because the means of "manipulation are limited only by the ingenuity of

man" and woman, *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971),

*cert. denied.*, 406 U.S. 932 (1972), Congress, the CFTC, and the Courts have

purposely refrained from creating carve-outs or safe harbors from the definition of

manipulation lest "crafty traders" evade the blanket prohibition of price

manipulation. J. Markham, *Manipulation of Commodity Futures Prices – The*

*Unprosecutable Crime*, 8 YALE J. ON REG. 281, 461 n. 526 (1991) (quoting

November 16, 1976 CFTC Memorandum). Instead, manipulation has been defined

affirmatively by the four-element test set forth at p. 2 *supra*.

However, Congress provides the CFTC Division of Enforcement ("DE") with a relatively limited budget.[1] Accordingly, Congress views "private lawsuits as "critical to protecting the public and fundamental to maintaining the credibility of the futures market". *Cange,* 826 F.2d at 594-595; *Curran*, 456 U.S. at 384-85 (part of Congress' efforts to prevent manipulation is to promote private law suits such as this one); *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 89 (S.D.N.Y. 1998).

But private actions alleging CEA manipulation have been relatively rare. There have been thirty-seven class actions alleging manipulation since the enactment of the CEA in 1975, or one about every 1.8 years.[2] These actions have not been subject to any of the abuses that Congress found to exist in securities law class actions. *Compare* CEA *passim with* Private Securities Litigation Reform Act, 15 U.S.C. §78u-4(b)(3)(B).

## COURSE OF THE PROCEEDINGS BELOW

---

[1] To police all the commodity futures markets and the largest derivatives markets on earth, the CFTC DE had an annual budget in 2012 of only $36,020,000. PRESIDENT'S BUDGET AND PERFORMANCE PLAN (FISCAL YEAR 2014), CFTC (Apr. 20, 2013), p. 9, available at www.cftc.gov/ucm/groups/public@newsroom/documents/file/cftcbudget2014.pdf. By comparison, the Securities and Exchange Commission had an enforcement budget in 2012 of $416,815,000. U.S.S.E.C. FY 2014, Congressional Budget Justification, p. 16, available at www.sec.gov/about/reports/secfy14congbudgjust.pdf.

[2] This is derived from a WESTLAW search of the ALLFEDS database specifying "class /3 action /p commodity! /s manip!" and culling duplicates and non-commodity cases.

8

Plaintiffs filed their consolidated complaint on September 12, 2011.  A-78-181.  Defendants moved to dismiss under FRCP Rule 12(b)(6). JA-60;ECF Nos. 91-93.  Plaintiffs opposed.  ECF Nos. 97-98.  Defendants replied.  ECF Nos. 102-103.

Oral argument was held on May 16, 2012.  JA-62.  Post-argument letters were submitted. JA-63, 238-242;ECF Nos. 114, 116, 120-121.  The Decision dismissed, but allowed Plaintiffs to seek to amend.  SPA-40.

Plaintiffs sought leave to amend under FRCP Rule 15(a), including extensive additional details in paragraphs 137(a)-(z) (A-332-344).  JA-65, ECF Nos. 131-132.  Defendants opposed.  JA-66-67;ECF Nos. 139-140.  Plaintiffs replied.  JA-67;ECF No. 144.

Decision II denied leave to amend the CEA manipulation claims on (and solely on) grounds of futility, and denied leave to amend the antitrust claims on grounds of the allegations could have been made earlier.  SPA-52-53.

### STATEMENT OF FACTS

#### A. Background

1.      (a) Commodity futures contracts are bilateral executory contracts. *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980).  "Bilateral" means here that, for every contract, there is a buyer (called a "long") and also a seller (called a "short").

9

(b) The "executory" means that longs and shorts must either trade out of their contracts or, at a specified future date, make delivery (the "short") and take delivery (the "long") of the commodity.

(c) The "open interest" in a futures contract is the amount of contracts open and not offset. The open interest is bilateral, and consists of an equal number of "long" obligations and "short" obligations (though, as here, the ownership may be concentrated on one side of the market in a much lower number of persons who hold the obligations than on the other side of the market).

(d) Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities. JA-269, ¶36. Instead, traders generally offset their futures positions before 99-plus percent of their contracts mature. JA-269, ¶36.

(e) To offset, a seller (or short) buys back a contract. A buyer (or long) sells a contract. This cancels their original obligation to the clearinghouse.

(f) The difference between the purchase price and sales price on the opening and offsetting transactions represents the profit or loss on such trade. A short initially sells and profits if its later purchase is at a lower price. A long initially buys and profits if its later sale is at a higher purchase price.

2.      Silver futures contracts and silver options contracts are traded on COMEX.  JA-267,¶31.  Each COMEX silver futures contract called for the delivery of 5,000 ounces of .99 purity silver.  A silver options contract gives the holder the right, but not the obligation to either buy (a call) or sell (a put) one underlying silver futures contract at a certain price.  *See* JA-267-275,¶¶31-47 generally regarding the different expiration months and other details of silver futures and silver options.

3.      The COMEX silver market is a relatively small market, and is vulnerable to manipulation by large positions or large trades.  JA-276-277,¶¶51-54.  A large concentration in the open interest on the short side of the COMEX silver market tends to reduce silver prices relative to gold.  JA-280-285,¶¶60 (a-h) (1% increase in concentration is associated with a 2.5% decrease in the proportion of silver to gold prices).

4.      Accordingly, by maintaining a large enough concentration on the short side of COMEX silver, a market participant could depress silver prices in a self-fulfilling prophecy type of trading.  JA-331-32,¶135.

**B. The CFTC Report Identifies Five Manipulation Probative Factors**

5.      Thus, on May 13, 2008 the CFTC Division of Trading and Markets issued the "Report on Large Short Trader Activity In the Silver Futures Market" ("CFTC Report").  Therein, the CFTC found that, over the 2005-2007 period,

11

bullion dealers and other commercial firms generally engaged in a non-manipulative profile of typical conduct as follows.

    a.    the holder of the largest short position in the COMEX silver market rotated among market participants,

    b.    each large player in the silver market was sometimes short and sometimes long,

    c.    the concentration on the short side of the COMEX silver market---which tends to depress silver prices, *see* ¶3 above---was comparable to or less than that in COMEX gold futures, JA-330-332,¶¶133-35,

    d.    the large shorts in the COMEX silver market did not make deliveries, and

    e.    COMEX silver prices increased more than COMEX gold prices.

    6.    The CFTC Report vouched for the above five factors as manipulation-probative factors.  It found that the specific facts under each of these factors pointed away from a downward manipulation of silver prices, and towards non-artificial prices during 2005-2007.  JA-328-330, ¶¶129(a)-132.[3]

_____

[3] However, the CFTC Report did not analyze individual days of trading, including June 26, 2007.  The CFTC Report also referred to platinum and palladium futures

7.    Because a bullion dealer both buys and sells bullion, this baseline profile of shifting short or long COMEX futures positions during 2005-2007 by JPMorgan and the commercial dealers was consistent with what one would expect from hedging by a bullion dealer.  The CFTC found that the foregoing facts set forth in ¶5 contraindicated any manipulation by a dominant short. [4]

## C. With Full Knowledge Of The CFTC Report, JPMorgan Radically Changed Its Conduct, In Each Of The Five Ways From Innocent To Manipulative Behavior

8.    From the foregoing and its experience,[5] JPMorgan well knew during the Class Period that, if it maintained a large dominant short position on the COMEX resulting in a larger publicly reported aggregate concentration[6] of the

---

prices, and London silver prices.  However, these benchmarks were manipulated and otherwise wholly inappropriate during the Class Period.

[4] A dominant futures position is one that can exert influence and control over prices.

[5] The JPMorgan silver traders during the Class Period were Chris Jordon and Robert Gottlieb.  They were very experienced.  Between 1996 and 2000, Robert Gottlieb, Chris Jordan and Michael Connolly worked together at the Precious Metals Trading Desk of HSBC and at Republic National Bank of New York, prior to its acquisition by HSBC.  JA-307,¶88.  In 2006, Jordan began his employment at JPMorgan where, until 2010, he was one of JPMorgan's principal COMEX silver futures and options traders.  JA-307,¶89.  In March 2008, Robert Gottlieb began his employment at JPMorgan where he served as a Managing Director/Trader.  JA-308,¶91.

[6] Because of the importance of concentration to prices, the CFTC publishes bi-weekly "Commitment of Trader Reports" aggregated (but they did not provide the names of or individual amounts held by) the amount of the open interest held by the four largest participants.

13

COMEX short position, JPMorgan would have a depressant effect in the small COMEX market on silver prices.  JA-334-336,¶¶137(e)-(i).

**1. Each One Of JPMorgan's Departures From Standard Bullion Dealer Conduct, Tended To Depress Silver Prices**

9.    With such knowledge, JPMorgan uniformly acted during the Class Period the opposite of what the CFTC found to be the non-manipulative conduct of a bullion dealer or hedger, and in conformity with manipulation-probative conduct. That is,

(a) JPMorgan was ALWAYS short COMEX silver (JA-299,¶80),

(b) JPMorgan was ALWAYS, by far, the largest short in the COMEX silver market from March 17, 2008 until the end of the Class Period, and typically had a larger COMEX short silver position than the next three largest holders combined (JA-298,300-1,¶¶79(a)-(b),84-86),

(c) JPMorgan thereby CAUSED the reported aggregate concentration in COMEX silver to be higher than that in gold (JA-335-37,¶137(h)-(k)),

(d) JPMorgan did repeatedly make deliveries on its silver futures (JA-329,¶130), and

(e) as described below, silver prices did fall by 29.6% as gold remained unchanged when JPMorgan established its dominant position during the start of the Class Period BUT, after the March 25, 2010 CFTC public hearing on

14

silver manipulation, JPMorgan's concentration fell by one third and silver prices then snapped back, greatly outperforming gold prices: 40% increase in silver prices vs. 21% increases in gold prices.  JA-250,257-58,297-99,301-307,329-30,¶¶3(d), 14, 79, 87, 130-33, 175-78;JA-274-77,297-99,330,¶¶46-47, 51, 76-79, 131, 133.

**2.   Thus, From March 17-August 15, 2008 The Five Fold Increase In JPMorgan's Short Silver Positions, Caused Silver Prices To Plummet <u>By 29.6% While Gold Prices Remains Almost Unchanged</u>**

10.    From March 17, 2008 until August 15, 2008, JPMorgan's short position increased FIVE fold to in excess of 130,000,000 ounces short. JA-301,¶86. JP Morgan then held a net short COMEX silver position that accounted **for approximately 56% of the net short** open interest held by the four largest short traders in the COMEX silver market on August 5, 2008.  JA-298-¶79(b).

11.    This meant that not only was JPMorgan the largest net short in the COMEX silver futures market.  JPMorgan's net short position was also **significantly larger** than the net short positions of the **next three largest** traders in the entire COMEX silver market **COMBINED**.  JA-298-¶79(c).

12.    JPMorgan's fivefold increase in its short silver position caused a substantial jump on August 5, 2008 in the short concentration reported by the

CFTC Commitment of Traders Report, dated August 5, 2008, for the four largest net short traders in the COMEX silver futures market. JA-296-¶¶73-4.

13.    During this five-fold increase in the size of JPMorgan's short position, COMEX silver prices plummeted by 29% while gold prices remained almost unchanged. JA-301-307,¶86-87. However, absent manipulation, a 1% move in gold prices indicates a .93% move in silver prices in the same direction. JA-282-83,¶60(f). *Minpeco, S.A. v. Conticommodity Services, Inc.*, 673 F.Supp. 684, 689-90 (S.D.N.Y. 1987)(Lasker, J) (denying summary judgment where "objective economic indicators such as the allegedly unusual pattern of …non-proportionality of silver with gold prices" indicated manipulation).

**3.    From March 25, Until CFTC Commission Chilton's -October 27, 2010 Statement, JPMorgan's Silver Concentration Fell By One Third And Silver Prices Increased By 40%, Twice As Much As Gold**

14.    Defendants' concentration in short COMEX silver fell by one third, from the time of the March 25, 2010 CFTC public hearing on whether silver was being manipulated, until the October 27, 2010 statement by CFTC Commission Chilton. This substantial lessening of JPMorgan's manipulative effect on silver

caused silver to outgain gold by far (40% increase vs. 21% increase). JA-250,257-58,297-99,301-7,329-30,366,¶¶3(d), 14, 79, 87, 130-33, 175-78.[7]

15.    Plaintiffs supplemented those allegations by also alleging that COMEX silver futures prices outperformed gold prices between the time of the CFTC hearing on silver manipulation on March 25, 2010 and three weeks later, on April 15, 2010.  *See* JA-302-3,¶87(b) (alleging daily changes in COMEX silver futures prices after the CFTC hearing on silver manipulation).

16.    After the initial impact on prices of the CFTC hearing on silver manipulation, COMEX gold prices then almost caught up with COMEX silver prices by August 26, 2010.  *See* JA-303,¶87(c).

17.    But on August 27, 2010, JPMorgan announced that it was closing its London silver office, where traders had bragged about depressing silver prices. *See* JA-303-4,¶87(d).  Once again, COMEX silver prices then greatly outperformed COMEX gold prices, increasing by 25.78% compared to 8.68% for

---

[7] Plaintiffs allege that the reduction in Defendants' concentration caused prices of the COMEX silver futures to snap back and go up in relation to COMEX gold prices.  ¶¶ 3, 14, 175.

This snap back of the silver prices relative to gold prices, after Defendants' illegitimate position pressure was substantially reduced, constitutes a separate and independently sufficient means of alleging silver price artificiality. *Compare In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 87 (S.D.N.Y. 1998) (reduction in manipulative position caused "the prices of copper futures contracts traded on the Comex [to] decline[…] dramatically").

gold prices through the time of the announcement on October 28, 2010 by CFTC

Commissioner Bart Chilton.  *See* JA-304,¶87(e).

18.    Plaintiffs further specifically allege that Commissioner Bart Chilton

made public statements, including on October 26, 2010, to the effect that he

believed there had been manipulation or related unlawful conduct in the COMEX

silver futures market.

> "I believe that there have been repeated attempts to influence
> prices in the silver markets.  There have been fraudulent efforts to
> persuade and deviously control that price.  Based on what I have
> been told by members of the public, and reviewed in publicly
> available documents, I believe violations to the Commodity
> Exchange Act (CEA) have taken place in silver markets and that
> any such violation of the law in this regard should be prosecuted."

Bart Chilton, *Statement at the CFTC Public Meeting on Anti-Manipulation and*

*Disruptive Trading Practices,* October 26, 2010*. See* ¶¶ 122-129.

### 4.    The 40% Higher Gold-Silver Ratio During The Class Period Than Before Was Caused By Defendants' Price Suppressing Conduct

19.    Corroborating the foregoing directional impact of JPMorgan's

dominant short position on silver price, Plaintiffs allege in detail that before and

after the Class Period, the gold-silver ratio was much lower.  But during the Class

Period silver's underperformance caused the gold-silver ratio to increase.

*Compare* JA-301-7,336,¶¶87(a)-(j),137(j) *with In re Sumitomo Copper Litig.*, 182

F.R.D. 85, 87 (S.D.N.Y. 1998)(Pollack, J) (before, during and after comparisons are a standard measure of price impact and damages).]

20.    Specifically, the gold-silver ratio was 49 at the beginning of the Class Period.  JA-262,¶137.   However, the large concentration by JPMorgan caused the gold-silver ratio to increase to an average of 69 during the Class Period through March 25, 2010. JA-262,¶137(j). This was a 40%-plus increase and 33% higher than the average for the one year prior to the Class Period and even greater than compared to the gold-silver ratio immediately before the Class Period.

21.    Finally, during the Class Period, the gold-silver price ratio fluctuated directly with the degree of concentration on the short side of the silver market, *i.e.*, higher concentrations reduced silver prices relative to gold and thereby produced a higher gold-silver ratio. JA-262,¶137(j).

22.    Plaintiffs plead in detail the absolute size, the percentage size, the size relative to other markets, the size relative to other players in the COMEX silver market, and the significant fluctuations in the percentage size of JPMorgan's large COMEX silver futures position.  JA-274-77, 330,¶¶3, 14, 46-7, 51, 57, 65-87, 95, 99, 110-20, 127-34, 175.

23.    From August 15, 2008 until March 25, 2010 CFTC hearing on silver manipulation, JPMorgan held approximately 24 - 32% of the total short open interest in **all** COMEX contracts, and frequently held large COMEX silver short

positions that were as large as the other three largest COMEX traders combined.  -249-50,301-¶¶3(b),86.  During this time, in important COMEX individual futures contracts expiring in the "front" months, JP Morgan at times held 32% – 40% or more of the entire short open interest.  JA249-50, 301-¶3(b), 86.

24.    JPMorgan's multiple steps contrary to those of an innocent trader, caused continued under performance by silver prices of gold prices for the March 17, 2008-March 25, 2010 period.

**5.    Thus, Not Only Was Each Of Defendants' Departures From Standard Bullion Dealer Conduct Designed To Suppress Silver Prices But The Increasing Or Decreasing Degree Of Such Manipulative Conduct Caused The Increasing Or Decreasing Degree Of Distortion Of Silver Prices**

25.    In sum, JPMorgan's multiple departures from standard bullion dealer conduct each tended to suppress silver prices, as implied by the CFTC Report and plausibly demonstrated through the fact allegations quoted at ¶¶9-24 above.

26.    Moreover, the increasing or decreasing degree of Defendants' manipulative conduct directly caused an increasing or decreasing degree of distortion in silver prices:

        a.  During the time of JPMorgan's greatest increase, from March 17 through August 15, 2008, COMEX silver prices declined by more

than 90 times as much as gold prices, 29.6% decline compared to almost no decline for gold. *See* ¶¶9(e) above.

b. During the time of JPMorgan's greatest decline in its concentrated short position, silver snapped back and outperformed gold by increasing twice as much as gold did. *See* ¶9(e) above.

c. When JPMorgan's large concentration became public on or around August 5, COMEX silver prices plummeted compared to gold prices. See Facts ¶¶10-13 above; see ¶JA-309-315, ¶¶97-111(g) (the allegations about big declines in prices in late July to August 15).

d. On August 15, when defendants engaged in strategic large volume trading to depress prices, silver prices fell by 6 times as much as gold prices. ¶35(a)-(i); see below.

27.    These mutually reinforcing facts dovetail with all the other particulars of Defendants' conduct to constitute objective facts from which Defendants' intent to suppress prices and successful and artificial suppression of silver prices, compared to the gold benchmark, may be reasonably inferred.  See below.

### D. In Addition To Being Highly Unusual Because It Was Contrary To The Standard Conduct Of Bullion Dealers, JPMorgan's Conduct Was Also Contrary To That Of A Hedger

28.    The London market was a professional market of bullion dealers and large hedgers who made large transactions with minimal effect on prices. The

COMEX was a small illiquid market in which transactions of significant size had significant impact on prices.   JA-333-334,¶¶137(b)-(c).  But COMEX was the "price leader" **virtually all of the time** and the London silver market prices followed the COMEX prices.  *Id.*¶¶137(a)-(d).

29.    Accordingly, the standard practice for a bullion dealer or large hedger was to make the large transactions in the London silver market.   *Id.*¶¶137(b).  Thereby, the bullion dealer or hedger economically was able to make higher priced sales because it had less downward effect on prices when it sold.   JA-335,¶137(f).  This created a larger spread and profit between the hedger's sale price on the London market and the price of whatever physical bullion or physical transaction it was offsetting.  JA-341-42,¶¶137(u).

30.    If JPMorgan had been transacting as a bullion dealer or as a hedger that was not trying to move the prices, it would have followed the standard practice for such dealers and hedgers, and would have transacted large position on the London market.   JA-335,¶137(f).  It would have been content there with the higher profit and spread that it was receiving between its London sales prices and the prices of any related offsetting bullion transactions.  JA-335,342-43,¶¶137(f),(v).

31.    Contrary to the standard economic conduct by a bullion dealer or large hedger to make large sale transactions at the higher prices available on large transactions in the London market, Defendants gave up the higher prices at which

they could have sold in the London market in order to uneconomically sell at lower prices on COMEX.   JA-334-35,¶¶137(e)-(f).   Through such large sales, Defendants caused lower COMEX silver prices. *Id.*

32.    This had a depressant and suppressant impact on COMEX silver futures prices in, first, Defendants' own transactions.  *Id.* It further caused the reported concentration on the short side of the COMEX market to be larger, which further depressed COMEX silver prices.  JA-335,¶¶137(f)-(g).  And it had the further price depressing effect resulting from the fact that COMEX was the price leader for London, and led the London silver price lower.   JA-334-35,¶¶137(d),(g).

33.    By transacting, contrary to standard practice of a large hedger in the COMEX market, JPMorgan suffered worse, lower prices for its sales. JA-333-35,342-43,¶¶137(a),(e),(v),(w).  But JPMorgan thereby had more of a downward effect on prices including in the multiple ways described below.   JA-340-41,¶137(t).

### E. Consistent With And Corroborating Their Large Position Manipulation, JPMorgan Also Manipulated Prices On Specific Days

### JPMorgan's Unlawful Manipulation on June 26, 2007

34.    (a) On June 26, 2007, COMEX silver prices fell by a statistically significant higher amount than gold prices or an index of gold, platinum, and palladium prices.  JA-282-83,314-15,¶¶60(f)-(g),111(f)-(g).  The prices for silver

23

decreased on June 26, 2007 to a low of $12.15 from the prior day settlement price of $12.877, JA-279,¶59, and the price decline just prior to options expiration on June 26, 2007 was extreme–a 4.6% move against a 1.4% decline in COMEX gold. JA-280,¶60.

(b) The trading volumes in silver on June 26, 2007 were higher by a statistically significant amount than gold or an index of gold, platinum, and palladium.  JA-289-90,314-15,¶¶64(f)-(g),111(f)-(g).  The volume of silver trading on June 26, 2007 was the third highest daily trading volume during the 1000-plus trading day period between January 3, 2005 and December 31, 2008.  JA-287-88,¶64(a).  Silver volume reached a factor of 4.5 times its average trading volume on June 26, compared to gold, which was only 1.1 times its average volume.  JA-288-89,¶64(d). Further, the extraordinary increase in trading volume was all accounted for by the front month contract, the July 2007 contract.  JA-290-91,¶64(h).

(c) Price movements in silver futures on June 26, 2007 were contrary to and inconsistent with market fundamentals, new information, competitive market activity, and the fundamentals of supply and demand. JA-293-94,¶66.  Other markets (not limited to gold) did not behave similarly to silver, and there were no fundamental explanations for the distorted silver futures market price moves on June 26, 2007.

24

(d) Some non-fundamental reason had to cause these price declines. JPMorgan's own broker, Marcus Elias, the high school wrestling teammate of JPMorgan's silver trader, Chris Jordan,[8] stated that JPMorgan was doing large selling during the day and bought back the contracts near the bottom of prices.

> JP Morgan executed its trades on this day through, at least, a futures floor broker named Marcus Elias. Marcus Elias was a former classmate and wrestling teammate of Chris Jordan, a senior silver trader at JP Morgan. After the close of floor trading on June 26, 2007, Marcus Elias acknowledged that he had executed purchase trades for JP Morgan at or near the lows of the market. Marcus Elias also executed sell orders on behalf of JP Morgan in the morning, which contributed to the price declines, and then purchased futures on behalf of JP Morgan subsequently as the market bottomed.

JA-279,¶58.

(e) **Motive.** Prior to June 26, JPMorgan had purchased sizable out-of-the-money puts in July silver futures between the strike price of $12.00 and $12.75, according to a witness with personal knowledge. JA-277-78,¶55.

(f) JPMorgan maintained its large out-of-the-money put positions until June 26, 2007, the day options on the July 2007 silver futures contract expired. This is economically unjustifiable. JA-293,¶65. Then, on June 26, JPMorgan

---

[8] Mr. Jordan left JPMorgan as assertions by a whistleblower of manipulation of the silver market circulated in early 2010. JA-307,327-28,¶¶89,123-27. After his departure and the CFTC hearing on March 25, 2010 on whether silver was being manipulated, JPMorgan's concentration in the silver market plummeted and silver prices greatly outperformed gold prices. JA-250,302-3,¶¶3(d),87(b).

flooded the market with large volume sell trades to depress silver prices.  JA-277-78,¶¶52,56.

(g) It was highly unusual for JPMorgan to remain in out-of-the-money options until the end of trading when there was no fundamental reason to expect the market to plummet.  JA-293,¶65.  This dovetails with the statement by JPMorgan's own floor broker, Mr. Elias, that supports Plaintiffs' allegations that JPMorgan was one cause of the price declines.  JPMorgan would not have knowledge of general market activities so as to irrationally hold on to an options position.  But JPMorgan **would** have full knowledge of what JPMorgan was going to do.  If JPMorgan knew it was going to impact prices, then holding these options longer than usual would have been rational because of the impending manipulation that JPMorgan knew it was going to execute.

(e) Traders who were short out-of-the-money puts were forced to cover, as those puts came into-the-money, by selling July 2007 futures, further reducing prices.  JA-278-79,¶57.  JPMorgan purchased those contracts at depressed prices and exercised its put options, thereby profiting on the manipulation.  *Id*.  Such profits were a compelling motive for JPMorgan's knowing but highly unusual conduct.

(f) JPMorgan manipulated prices of silver futures and options contracts, not only to mitigate potential losses on out-of-the-money options, but also to turn a massive profit.  JA-277-79,¶¶55,57.

### JPMorgan's Unlawful Manipulation on August 14-15, 2008

35.    (a) On August 15, 2008 silver prices fell by a statistically significant higher amount than gold prices or an index of gold, platinum, and palladium prices.  JA-282-83,314-15,¶¶60(f)-(g),111(f)-(g).

(b) On August 15, COMEX silver prices fell from $14.23 per ounce to $12.815, which is statistically significant JA- 311,¶111, and the price behavior during on August 15, 2008 was extreme – a very large decline of almost $1.41 per ounce, or approximately **12%**, in COMEX silver futures, against a **2.7%** decline in COMEX gold. JA-250,¶4(b).

(c) Additionally, the close for silver futures on the COMEX was out of line with the spot price of silver fixed in London on August 15, 2008, and spot silver declined by 8.26% on August 15, 2008.  JA-311-12,¶111(a).  The decline of 8.26% in the spot silver price on August 15, 2008 represents the 6th lowest return (out of 1,004 days) between January 3, 2005 and December 31, 2008.  JA-311-12,¶111(a).

(d) The volume of trading spiked in afterhours trading on August 14, 2008, when the market was unlikely to have as much liquidity as during business

hours, JA-316,¶113, and the silver futures trading volume increased approximately 90% on August 15, 2008, which when compared with surrounding trading days was extremely high.  JA-318,¶114(a).

(e) Further, the trading volumes in silver on August 15, 2008 were higher by a statistically significant amount than gold or an index of gold, platinum, and palladium. JA-289-90,314-15,¶¶64(f)-(g),111(f)-(g). The extraordinary increase in trading volume was all accounted for by the front month contract, the September 2008 contract on August 15, 2008.  JA-316,¶113.

(f) No new information came into the market which might account for the almost 12% price decrease on August 15, 2008.  JA-250,323-34,¶¶4(b),115. Indeed, price movements in silver futures on August 15, 2008 were contrary to and inconsistent with market fundamentals, news flow, market activity, and competitive market supply-demand fundamentals.  JA-323-24,¶115.

JPMorgan had the largest financial motive by far to depress COMEX silver prices on August 15 (more short positions than the next three largest traders on COMEX combined).  JA-294-309,366,¶68-87, 95, 176.

(g) Someone had to cause the extraordinary declines on August 15.  A first-hand witness started that JPMorgan sold significant silver futures contracts on August 14-15, 2008 to depress prices.  JA-315,¶112.

(h) **Motive**.  Moreover, Plaintiffs alleged that according to witnesses, prior to August 15 JPMorgan accumulated a significant amount of out-of-the-money September 2008 put options.  JA-324,¶116.  As prices decreased, these September puts became much closer to being in the money.  Accordingly, the traders who had been selling these puts had to close out their positions by buying back the September puts on August 15, 2008.  JA-324,¶117.  But Chris Jordan, a JPMorgan silver trader, then sold to close out large amounts JPMorgan September puts after the price decline, at an enormous profit.  JA-324,¶118.

(i) By August 15, 2008, JPMorgan held significantly more net short COMEX silver. JA-249-50,¶3(b).   JPMorgan thus additionally gained a **$220,000,000 increase** in its mark-to-market value of its COMEX value short position by virtue of the declines in prices on August 15.  JA-250,¶4(b).  The $220,000,000 increase was more than six times the annual budget of the CFTC DE.

36.    Additionally, Plaintiffs' proposed Amended Complaint, adds specific allegations reflecting statistical analyses of the June 26, 2007 and August 14-15, 2008 trading days, which show that the market behavior exhibited statistically-significant differences as compared to other benchmarks and as compared to a longer-term trading period (1,004 days) of silver market prices.  JA-251,280-85,287-93,311-15,317-23,¶¶4(d),60,64,111,114, and associated tables.

29

### F. Gold Is The Traditional Benchmark For Silver Prices And The Other Potential Benchmarks Were Themselves Manipulated And Otherwise Inappropriate During The Class Period

37.     Neither platinum nor palladium prices were highly related to silver prices, whereas gold prices are highly related.  A 1% increase in gold implied a .93% increase in silver. JA-306,¶87(h)-(i).

38.     The prices of platinum and palladium were the subject of a separate manipulated upwards to an apex amount in February and March 2008, which was the beginning of the measuring period for the start of the Class Period which was March 17, 2008.  JA-304-5,¶87(f); *compare*, Third Consolidated Amended Class Action Complaint in *In re Platinum and Palladium Commodities Litigation*, No. 10 Civ. 3617 (S.D.N.Y.) (WHP) (ECF No. 80) *with* Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions in *In the Matter of Moore Capital Management, LP, et al.*, CFTC Docket No. 10-09 (CFTC April 29, 2010) (available at www.cftc.gov).

39.     The manipulated benchmark prices of platinum and palladium were inappropriate benchmarks for silver, especially when platinum and palladium, prices were near the apex in their degree of manipulation as the Class Period here starts on March 17, 2008.  JA-304-5,¶87(f)-(g).  After such manipulation subsided,

platinum and palladium prices fell much further than gold did from March 2008 forward.  JA-304-5,¶87(f).

40.    London follows COMEX silver and 91-100% of the price discovery during the Class Period occurred on COMEX.  JA-333-34,¶137(c)-(d).   Plaintiffs have plausibly alleged that the price discovery occurred on the COMEX, which was the price leader (100% of the time for two years during the Class Period), and that London silver prices followed COMEX. JA-334-35¶137(d),(g).  Therefore, London follows COMEX and is not a benchmark as to whether the COMEX silver is manipulated.  *Id*.

41.    With respect to June 26, 2007 and August 14-15, 2008 the CFTC Report did not address, much less purport to provide, the means of analyzing a daily trade manipulation.  CFTC Report (ECF No. 140-6) *passim*.

42.    The CFTC Report expressly found that London silver followed COMEX silver by adjusting the following morning.  CFTC Report, p. 7-8.

## STANDARD OF REVIEW

In reviewing a decision dismissing a complaint as a matter of law pursuant to Fed.R.Civ.P. 12(b), this Court must review *de novo* each conclusion of the District Court.  *See Galiano v. Fidelity Nat. Title Ins. Co.*, 2012 WL 2550596, at *2 (2d Cir. Jul. 3, 2012).  The Court must construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all

31

reasonable inferences in Plaintiffs' favor. *Anderson News, LLC v. American Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012) ("*Anderson*"). That Plaintiffs' inference is less plausible than Defendants' is irrelevant so long as Plaintiffs' inference is plausible. Denial of motion to amend is reviewed on abuse of discretion except as to futility which is *de novo.*

## ARGUMENT

### A.    RULE 8(a) PLEADING STANDARD

FRCP Rule 8(a) applies to antitrust claims. *E.g., Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 317 n.1 (2d Cir. 2010).

The CFTC has described CEA manipulation as a form of "restraint of trade." *In the Matter of Global Minerals & Metals Corp.*, CFTC Docket No. 99-11, 1999 WL 1023586, *n.51.

Courts apply Rule 8(a) to CEA manipulation claims that were based on large positions or large trades. *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012); *U.S. Commodity Futures Trading Comm'n v. Enron Corp.,* 03-cv-9001, 2004 WL  594752 (S.D. Tex. Mar. 10, 2004); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.,* 554 F. Supp. 2d 523, 530-31 (S.D.N.Y. 2008) (Chin, J).

Regarding the manipulative intent element of CEA manipulation, Rule 9(b) provides that "intent, knowledge, and other conditions of a person's mind may be

alleged generally." Reliance and deception are not elements of CEA manipulation. The CEA manipulation claim here did not sound in fraud. The Decisions employed an FRCP Rule 8(a) pleading standard.

### B.   PLAINTIFFS PLAUSIBLY ALLEGED PRIMARY MANIPULATION

Plaintiffs plausibly allege each of the four elements of CEA manipulation. *See* p. 2 *supra* quoting this Court's decision in ***DiPlacido***, 364 Fed.App'x at 661.

#### 1.   Plaintiffs Overwhelmingly Alleged The Ability To Influence Element Which Makes Plaintiffs' Pleading Of The Other Three Elements More Plausible

Defendants conspicuously did not contest their pronounced ability to influence prices in the small COMEX silver market during trading on June 26, 2007, August 15, 2008, or otherwise during the Class Period. SPA-19. Because courts have recognized that the elements of manipulation are "factually and legally interdependent," ***In re Soybean Futures Litig.***, 892 F.Supp. 1025, 1045 (N.D. Ill. 1995), Defendants' substantial ability to influence prices improves the plausibility of the allegations of the other elements, especially intent and causation. *See* below.

#### 2.   In Multiple Independently Sufficient Ways, Plaintiffs Plausibly Alleged That Defendants Intended To Manipulate Silver Futures Prices Between March 17, 2008 And October 27, 2010

##### a.   Motive And Opportunity Or Ability To Suppress Prices

Manipulative intent may be pled by alleging facts showing that the defendants had both motive and the opportunity or ability to manipulate. *In re Amaranth Nat. Gas Commod. Litig*., 587 F.Supp.2d 513, 530 (S.D.N.Y. 2008); *see also* **In re LIBOR-Based Financial Instruments Antitrust Litig**., No. 11 MD 2262, 2013 WL 1282338, at \*37 (S.D.N.Y. Mar. 29, 2013).[9]

First, Plaintiffs overwhelmingly alleged, and Defendants conceded, Defendants' substantial ability or opportunity to suppress prices in the small illiquid COMEX silver market. **Facts** ¶28; sub-point "1" above.

Second, Defendants not only had the largest COMEX short position during the Class Period. JA-249-50,297-99,301;¶¶3,79,86. Their 130,000,000 ounce-plus short position was typically larger than that of the next three participants combined, constituted 24-32% of ALL silver futures contracts in ALL expiration months in the small COMEX market, and 30-40% of active, front month silver futures contracts. JA-249-50,294-95; ¶¶3,68-69. This unprecedented size of Defendants' enormous short positions provided Defendants not only with an

---

[9] *See also* ***DiPlacido***, 2008 WL 4831204, at \*29 (a demonstrable motive may support an inference of specific intent); ***CFTC v. Amaranth Advisors, LLC,*** 554 F.Supp.2d 523, 533 (S.D.N.Y. 2008) (defendants' profit motives "render the inference of intent even more plausible"); ***Kohen v. Pacific Inv. Mgmt. Co. LLC***, 244 F.R.D. 469, 484 (N.D. Ill. 2007)("***PIMCO***") (denying motion to dismiss and finding that plaintiffs had adequately pled intent where they alleged the motive of the manipulation was to "increase financial return").

unprecedented ability to suppress prices but also an unprecedented financial

motive to do so.  JA-275,308-09,331;¶¶47,95-96,134.

Defendants had (by far) the largest financial incentive of any market

participant to depress COMEX silver prices and, for example, Defendants also

made $220,000,000 in mark to market trading profits on one day alone, August 15,

2008, from a price decline of which Defendants were one cause and which also

generated additional realized profits for their expiring silver options positions.  JA-

294-307, 308-309, 366,¶¶68-87, 95, 176.

> **b.    Knowledge That Large Positions And Trades Will
> Impact And Are Impacting Prices, While Taking
> Such Large Positions And Making Such Large Trades**

Knowing actions to inject "large" positions into a market in order to move

prices, also justify an inference of manipulative intent.  *PIMCO*, 244 F.R.D. at 484

(reasonable inference that defendants knew the market was susceptible to

manipulation by large positions, and were "well aware of their potential ability to

influence prices" by engaging in the conduct they did; *PIMCO* also relied on

motive, *see supra*).

Just as the defendants in *PIMCO* possessed manipulative intent based upon

their knowledge that their large positions would move prices and benefit

defendants financially, JPMorgan well knew from the CFTC Report and its own

deep experience and sophistication as a bullion dealer that prices in the small

COMEX market were vulnerable to and were being substantially suppressed by Defendants' large concentrated short positions and large trades. JA-249-255, 274-277, 296-299,¶¶3-6, 46-47, 51, 54, 72-80; *see infra*.  With such knowledge, Defendants intentionally planned to and repeatedly and systematically did engage in such conduct over an extended period, knowing that they were suppressing prices.

### c.    Trading Strategy That Is Highly Unusual Or Even Uneconomic But Accomplishes Its Goal And Becomes Profitable Through Its Impact On Prices

In addition to knowingly suppressing prices through large positions and trades while they had the largest motive and the largest ability or opportunity to suppress prices in the small COMEX market, Defendants also engaged in highly unusual or uneconomic conduct.  And another recognized way to prove (and, therefore, to plead) manipulative intent is by alleging that the accused engaged in uneconomic or highly unusual conduct.

The CFTC in ***DiPlacido*** took pains to note that manipulative intent has been inferred from the fact that a small market participant had "purposely paid more than he would have had to pay" in order to move prices up.  2008 WL 4831204 at *26, *citing In re David Henner*, 30 Agric. Dec. 1151, 1174 (1971); *see also DiPlacido*, 2008 WL 4831204 at *28 (manipulation where "uneconomic trading

36

strategies" were undertaken "in order to influence prices"), *aff'd* 364 Fed.App'x at 661.

This justified an inference of manipulative intent because, ordinarily, market participants seek to sell for the highest price and buy for the lowest price, not *vice versa*. *Id.* It is highly unusual or even uneconomic for a trader intentionally to sell for less or to buy for more than they may. *Id.* Such transactions are not legitimate parts of the supply-demand equation for prices. *Id.*

With respect to "unusual" conduct, and as the Decisions entirely failed to mention, Defendants, during March 2008-October 2010, intentionally engaged in the exact opposite of that conduct which the CFTC found to be the non-manipulative, typical conduct of a bullion dealer or hedger: Defendants (1) were always short (JA-295-96,¶¶70-71), (2) always the largest short in the market (JA-297-99¶¶79-80,86), (3) were a dominant short and thereby caused the publicly-reported COMEX silver short concentration to be greater than that for gold (JA-250,257-58¶¶3(c)-(d), 14), and (4) Defendants made deliveries(JA-329¶¶130). [10]

As Defendants well knew, each of the four extreme departures by Defendants from the profile of non-manipulative conduct, tended to suppress and

---

[10] When JPMorgan had a dominant short position, it made deliveries in satisfaction of its COMEX silver futures contracts. JA-249-250, 254-55, 295-307, 329, ¶¶ 2, 3, 5, 68-87, 130. The CFTC found that the absence of deliveries during 2005-2007 contraindicated manipulation then. JA-196, 205. Deliveries by a dominant short during 2008-2010 thus indicate a classic manipulative intent. *In re Cox & Frey*, CFTC No. 75-16, 1987 WL 106879 at *13-15 (CFTC July 15, 1987).

did suppress prices. These objective facts fully justify the inference that Defendants engaged in all these highly unusual departures from the non-manipulative norm precisely in order to suppress prices.

Indeed, in CEA manipulation cases, manipulative intent proceeds from the premise that persons, particularly sophisticated market participants, intend the consequences of their actions, *DiPlacido*, 2008 WL 4831204 at *10. If they engage in conduct which departs from the norms in ways that tend to distort prices, then manipulative intent will be inferred. Such inference is especially appropriate here, where a large sophisticated bank and silver prices are at issue. In addition to a large bank's organic sophistication about currencies, gold and silver, Plaintiffs allege that JP Morgan's silver traders experience in the market since the mid 1990's and before. *E.g*., Robert Gottlieb originally worked with Chris Jordan and Michael Connolly as silver traders at HSBC between 1996 and 2000. JA-307, ¶¶ 88-89. *See In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 500 (S.D.N.Y. 2004) (the court was "not persuaded that these Defendants are ingénues making their first appearance at the debutante ball").

With respect to "uneconomic" conduct, *DiPlacido*, 2004 WL 3326624 upheld the reasoning, after a full trial, that the uneconomic trades at issue necessarily caused artificial prices because of the illegitimate demand factor that the manipulator intentionally paid more than they had to. Here, Plaintiffs alleged

38

uneconomic conduct by Defendants through a repeated pattern of incurring

additional transactional costs to sell in the COMEX market for less than

Defendants could receive in London.  JA-254-55,309,325,332¶¶5-6,96,121,136.

Thereby, Defendants exerted greater downward effect on prices, which increased

the mark-to-market value of and profited their enormous short positions.  JA-285-

86, 308-09,¶¶62-63,95.[11]  Systematically selling for less was uneconomic, but it

tended to suppress prices and thereby benefitted Defendants' enormously large

short positions.

> **d.    In The Foregoing Circumstances, The *Anderson* "Less Plausible Inference" Test Applies And Is Satisfied**

Each of the foregoing aspects of Defendants' conduct should independently

more than suffice to plead plausibly Defendants' manipulative intent.  The most

that any contrary arguments do, is create competing inferences about manipulative

intent.  *See CFTC v. Brian Hunter*, 07-cv-6682, ECF No. 90 at 3 (S.D.N.Y. Jan.

31, 2013) ("[i]t is generally improper to decide the merits of a case at the summary

judgment stage where the inquiry 'involves a dispute concerning the state of mind

and conflicting interpretations of perceived events.'").

---

[11] Plaintiffs also alleged multiple specific uneconomic trades made at illiquid times of day which benefitted JPMorgan more than any other participant. JA-255, 275, 315-17, 331-32, ¶¶6, 47, 112-13, 135. Unlike the trades on June 26 and August 15, these trades are not explicitly alleged to have been made by JP Morgan.

However, at the motion to dismiss stage, Plaintiffs need only allege a plausible inference of intent, which suffices even if Defendants' explanations are more plausible (which they are not, see below). *Anderson*, 680 F.3d at 185.

###### e. The Decision Failed To Consider The Totality Of The Circumstances Including Plaintiffs' Most Important Allegations

The Decision erred factually, legally, and procedurally in finding that Defendants' manipulative intent was not plausibly alleged.

Whether the market participant had the specific intent to influence market prices may "be inferred from the objective facts and may, of course, be inferred by a person's actions and the **totality of the circumstances**."[12] (Emphasis supplied).

The Decision not only failed to consider the "totality of the circumstances" but it failed to express consideration of Plaintiffs' most important allegations: that Defendants intentionally engaged in the exact opposite of the four types of conduct which the CFTC Report found to be non-manipulative and typical of dealers and hedgers during 2005-2007.  SPA-19-23.

---

[12] *In re DiPlacido*, 2008 WL 4831204 at *10, citing *In re Hohenberg Bros. Co.,* [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477 (CFTC Feb. 18, 1977);  *PIMCO*, 244 F.R.D. at 482 (same).

The CFTC in *DiPlacido* further held that at trial "it is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'" 2008 WL 4831204 at *26, quoting *Indiana Farm Bureau,* 1982 WL 30249 at *6 (citation omitted).

### f. The Decision Mistakenly Found That Plaintiffs Alleged That Defendants Were Hedging, And Then Compared This Mistaken Version Of Plaintiffs' Claim To Erroneously High Pleading Requirements

Worse, the Decision mistakenly found that Plaintiffs supposedly alleged that Defendants were hedging. SPA-20 ("Plaintiffs' claims concluding that JPMorgan … possessed the intent to hedge its holdings" and affect prices is insufficiently supported).

The Decision then compared its misapprehension of Plaintiffs' case to an erroneously high standard. It found that Plaintiffs' manipulative intent allegations lacked plausibility because they failed to "reference …specific communications between the Defendants about any specific plan to cause artificial prices or an artificial price trend in the silver futures market." SPA-21. The Decision cited CFTC enforcement actions that, unlike here, provided private plaintiffs with documents or other information about "specific communications" at the time the private plaintiffs filed their complaint. *Id.* citing to ***Parnon Energy***, ***Amaranth Advisors*** and ***Enron***.

By converting the exceptionally high allegations made in those rare cases into the threshold minimum in which "courts have applied the pleading standard under Rule 8(a) and found intent to manipulate to have been pled sufficiently," SPA-21, the Decision made bad law and bad policy. Regarding policy, the

Decision effectively eliminated the Congressionally intended additional deterrence from the private action under Section 22(a). It did so by rendering the Section 22(a) claim capable of being adequately pleaded only when the CFTC has already acted.

The Decisions failed to cite ***PIMCO***, 244 F.R.D. at 482, a case cited by Plaintiffs, where intent was inferred from the "totality of the circumstances," no CFTC investigation ever occurred, and the case resulted in the second largest class action settlement in the history of the CEA. JA-61;ECF No. 97.

Coupled with all the foregoing errors, the starting point for both the Decision and Decision II was that they severed what they found to be Plaintiffs' allegations that JPMorgan knew that its unusual conduct was suppressing prices, and that JP Morgan had a motive to suppress prices, from the issue of intent. SPA-20-22, 46. Obviously, knowledge of price impact alone does not necessarily equal intent: "Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the [Commodity Exchange Act]." SPA-45 (same).[13]

But the Decision also apparently failed to consider or held against the proposition that knowledge was, in all the circumstances, probative of intent.

---

[13] Although the Decision cited to *Amaranth* for support that knowledge is not indicative of manipulative intent, *Amaranth* itself later did infer intent from knowledge. *Amaranth*, 587 F.Supp.2d at 542. However, *Amaranth* also found that knowledge alone does not equal intent. *Id.* at 539.

Decision, *passim*.  Similarly, the Decision also acknowledged Plaintiffs' detailed allegations of Defendants' motive to suppress prices.  SPA-20.  Once again, though, the Decision apparently failed to consider whether such extraordinarily large motive was probative of manipulative intent.  These failures were contrary to this Court's approach in other contexts.  *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)(strong inference of fraudulent intent may be pleaded where defendants "knew facts or had access to information suggesting that their public statements were not accurate").  *See also Cosmas v. Hassett*, 886 F.2d 8,12 (2d Cir. 1989)(intent pleaded where defendants made or authorized statements touting importance of sales to China when they knew or should have known that Chinese import restrictions would severely limit such sales).

> **g.     Contrary To The Decision, The Defendants' Proffered Website Fully Supports The Complaint Rather Than Undercuts It**

Decision II made findings of fact that were contrary to the proposed complaint.  The findings were that there supposedly was no means of hedging silver exposures on the London Market.  SPA-46-47, citing JA-400, Davidoff Decl. Ex. D ("Website of the London Bullion Market Association").

The webpage offered by JPMorgan and relied upon by Decision II was entitled "The London Market." The single page relied on by the Decision merely states that "London is the focus of the international Over-the-Counter (OTC)

43

market" for silver. The ambiguous over-the-counter or OTC market is **not** defined, nor is the term limited to physical bullion. JA-400. However, such webpage contained a "Publications" button, linked to a "Market Guide" button. Clicking those buttons produces a 2008 LBMA brochure entitled "A Guide to the London Precious Metals Markets," which (at 13) describes LBMA business as providing "price risk protection through forward or option hedging." http://www.lbma.org.uk/pages/printerFriendly.cfm?thisURL=index.cfm &title=market_guide&page_id=39. Such over-the-counter forward contract or option contract hedging would be the same, functionally, as futures and options hedging on the COMEX, and might be more flexible and less costly. Thus, this brochure explains the "OTC" ambiguity in the webpage relied upon by Decision II.

To be sure, the single webpage does say that the way in which the London market is "[u]nlike a futures exchange" is that market participants "typically trade with each other and with their clients on a principal-to-principal basis which means that there is no clearing house and all risks, including those of credit, are between the two counterparts to a transaction." JA-400. But this absence of the clearing house does not prevent hedging. The single webpage supports, rather than warrants premature summary judgment against, Plaintiffs' allegations that JPMorgan could have transacted in the London OTC market through the use of

OTC forward or option contracts to hedge "all risks" and any risks it claimed to have in silver.

Decision II erred (a) substantively, in rejecting Plaintiffs' plausible allegation that JPMorgan's trading on COMEX instead of London was probative of its manipulative intent as well as its causation of artificial prices, and (b) procedurally in making any findings against the Complaint's allegations based upon inferences drawn in favor of the movant from an ambiguous reference on a single webpage that was contrary to the other parts of a judicially-noticed website. *See Muller-Paisner v. TIAA*, 289 Fed.App'x 461,466n.5 (2dCir.2008)(taking judicial notice of defendant's website only "for the fact of its publication"). The Decision II also erred in relying on Def. Mem. in Opp. To Leave to Amend at 11 n. 6. SPA-52 DecisionII at 11.

### 3.    Plaintiffs Plausibly Alleged Defendants' Intent To Manipulate On June 26, 2007, August 15, 2008,

Plaintiffs have also alleged that JPMorgan engaged in stand-alone downward manipulations of COMEX silver prices on June 26, 2007 and August 15, 2008 (the August 15, 2008 trading day began on the evening of the 14th). Each of these manipulations suffices to state a standalone manipulation in violation of the CEA. And they mutually corroborate one another and the long-term manipulation.

In addition to Defendants' conceded ability or opportunity to manipulate prices on June 26, 2007 and August 15, 2008, Plaintiffs plausibly allege that Defendants also had an extremely substantial financial motive to do so.  Facts par 33-34.

First, this motive consisted of large amounts of out of the money puts in the expiring put option, which was the July 2007 contract for June 26, 2007 and September 2008 contract for August 15, 2008. *Id*. On each day, JPMorgan engaged in the highly unusual (otherwise uneconomic) conduct of holding on to these out of the money puts until the last day of trading.  But a rational, economic trading strategy would have been to sell them earlier when the time value permitted more proceeds.  However, if JPMorgan knew that it was going to exercise its conceded ability to manipulate prices on these two days, then this otherwise irrational and highly unusual holding to the bitter endn made eminent sense.  *Id.*

Moreover, on August 15, 2008, JPMorgan had by far the largest motive of any participant in the silver futures market to depress silver futures prices. *Id.*  Its motive was greater than that of the next three largest traders combined. *Id*  In fact, from the price depression on August 15, JPMorgan made $220,000,000 in additional mark to market profits on its enormous COMEX short silver position *i.e.,* more than six times as much as the annual budget of the CFTC DE.

46

The enormous motive and conceded ability of JPMorgan to manipulate

prices, amply supports an inference of manipulative intent under the precedent

developed *supra*.

Moreover, Morgan's highly unusual uneconomic behavior in holding to the

end, is explained plausibly by an intent to manipulate prices, at the end of trading.

This highly unusual or uneconomic conduct further supports an inference of

manipulative intent under the foregoing precedent. Plaintiffs' detailed allegations

of JPMorgan's large sales to depress prices (including based upon the statements

of its own broker as to June 26, 2007), along with the presence on both days of

Chris Jordan as the JPMorgan trader in charge, add to the plausibility of the

manipulative intent inferences.

**4.    Plaintiffs Plausibly Allege The Existence Of Artificial Prices**

      **a.    Means of Alleging Artificial Prices**

Under the CEA, artificial prices may be pleaded by alleging **any** one of the

following:  the observed prices (a) were contemporaneously out of line compared

to an appropriate price benchmark[14], (b) changed substantially after the termination

---

[14] *Minpeco v. ContiCommodity Svcs., Inc*., 673 F.Supp. 684, 689-90, 694
(S.D.N.Y. 1987) (deviation of silver prices from gold prices indicated artificiality);
*In re Sumitomo Copper Litig*., 182 F.R.D. 85, 90 n. 6 (S.D.N.Y. 1998) (price
artificiality may be determined by "historical price comparisons ... comparison of
spreads . . . .") *with Great Western Food Distrib., Inc. v. Brannan*, 201 F.2d 476,

or reduction of Defendants' manipulative impact,[15] (c) were produced by a supply and demand equation that included an illegitimate factor of supply or demand,[16] or (d) were more volatile than usual.[17]  See Facts *supra*.  As set forth in the Facts, Plaintiffs have alleged non-conclusory facts supporting each and **all four** of the foregoing well-recognized ways of inferring price artificiality.

Plaintiffs also went further.  They also plausibly alleged that, due to increases or decreases in Defendants' large positions, and due to Defendants' large trades, COMEX prices substantially decreased or increased at specific times.  Facts ¶10-36 *supra*.

Thus, Defendants devoted only one small footnote to an argument to the element on artificial prices.  Docket #90 at 19 n.18.

---

483 (7th Cir. 1953) (court analyzed historical spread relationships and found that the spread price of the at issue futures contract was "abnormal").

[15] ***In re Sumitomo Copper Litig.****,* 182 F.R.D. 85, 87 (S.D.N.Y. 1998) ("when Sumitomo, under intense government scrutiny, liquidated forward contracts for thousands of tons of unneeded copper . . . . the prices of copper futures contracts traded on the COMEX declined dramatically").

[16] ***In re Anthony J DiPlacido***, CFTC No. 01-23, 2008 WL 48312 at *30 (CFTC Nov. 5, 2008) ("when a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial*"), aff'd sub nom.,* ***DiPlacido v. Commodity Futures Trading Comm'n****,* 364 Fed.App'x 657, 661 (2d Cir. 2009)*, cert. denied,* 130 S.Ct. 1883 (2010); *see also **In re Indiana Farm Bureau Coop. Ass'n Inc***., CFTC No. 75-14 1982 WL 30249 at *39 n. 2 (CFTC Dec. 17, 1982) (if one of the factors that creates the prices is illegitimate, then the resulting price is necessarily artificial).

[17] Increased "volatility" is a fourth, classic indicator of price artificiality in the commodity futures markets.  ***Minpeco, S.A. v. Conticommodity Services, Inc***., 552 F.Supp. 327 (S.D.N.Y. 1982).

**b.    The Decision's Multiple Errors Regarding Artificial Prices**

However, the Decisions erroneously found that Plaintiffs failed adequately to allege artificial prices.  SPA-24-30,DecisionI at 24-30.

Both Decisions erroneously failed to accept Plaintiffs' reliance on gold prices as an acceptable benchmark for silver prices at the pleading stage.  *Compare Id*.[at 24] ("But Plaintiffs raise these allegations without first explaining why COMEX silver futures prices should be compared solely to 'the benchmark of gold prices.'") *with **Minpeco***, 673 F.Supp. at 689-90 (S.D.N.Y. 1987) (denying summary judgment where "objective economic indicators such as the … **non-proportionality of silver with gold prices** must have alerted market professionals to the manipulation of the silver futures market.")(Emphasis supplied).

Contrary to the Decision, Plaintiffs **did** expressly "explain" and allege that the CFTC Report, considering four publicly verifiable relationships concerning price, itself treated gold as a benchmark for silver:

(1) Silver prices went up from 2005 to 2007 and even increased more than gold and other precious metals did.

(2)  The holdings of silver among the top four holders of COMEX short positions were comparable to those in gold and much less concentrated than those in platinum and palladium from 2005 to 2007.

49

JA-329, Consol.Compl.¶129(b); JA-336,¶137(j).  Given that gold and silver are the former media of exchange (before paper money), the CFTC's use of gold as a benchmark for silver prices was obviously reasonable.  See *Minpeco*, 673 F.Supp.at 689-90.

Plaintiffs further alleged that gold had the most predictive value as a benchmark for silver: 0.93% increase in silver for every 1% increase in gold prices. The DecisionII failed to address this allegation.  *Compare* ¶¶60(a)-(h),111(f)-(g) with SPA-49DecisionII [at 8].

Relatedly, the Decision sought to impose London Bullion prices as the sole benchmark for silver.  SPA-49,DecisionII [at 8].  This is improper on a Rule 12(b)(6) motion.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104,111,113 (2dCir.2010), citing *Faulkner v. Beer*, 463 F.3d 130,134 (2dCir. 2006)(on Rule12(b)(6) motion, error to interpret email as stating intention to resign employment).[18]  Plaintiffs alleged in detail that London prices **follow** COMEX silver.  Plaintiffs further alleged in their amended complaint that 91-100% of the

---

[18] It also misapprehends the CFTC Reports, which stated that the LBMA "price is considered to be the benchmark price for trading of physical silver."  JA-197, 2004 Report [at 5]; JA-_n.6, 2008 Report [6.n.6] (same).  Nothing in either Report may be fairly interpreted as the Market Oversight Division's selection of LBMA silver bullion as a preferred benchmark for COMEX silver futures, or as disparaging Plaintiffs' use of COMEX gold futures as an appropriate benchmark.   *See also* JA-200-01,2008 Report [at 8-9](staff compared silver futures market to "similar futures markets (i.e., gold, platinum, palladium, and copper….")).

price discovery during the Class Period occurred on COMEX.  JA-333-34,¶137(c)-(d).  Therefore, during the Class Period, London prices followed COMEX prices.  London prices were **not** a benchmark, let alone **the** benchmark, of whether COMEX silver is manipulated.  *Id*.

Third, the Decision also erroneously imposed platinum and palladium as benchmarks on any analysis of silver prices.  The CFTC Report did use platinum and palladium as benchmarks in its analysis of the 2005-2007 time period.  But Plaintiffs alleged that those prices were themselves manipulated during the period October 2007 through June 2008.  JA-304-05.  Also platinum and palladium are, generally, **not** appropriate benchmarks for silver because they do not have predictive value – palladium has none, and platinum has very slight predictive value *even when platinum and palladium have not been manipulated.* JA-281,283-85,305-06,314-15,¶¶60(c)-(d),(g)-(h),87(g)-(j),111(g).

Fourth, having imposed platinum and palladium as benchmarks on Plaintiffs for long term manipulation (when the manipulation of platinum and palladium polluted comparisons beginning during or before the start of the Class Period), the Court then found that platinum and palladium should not be considered as benchmarks when they indicated that prices were manipulated on two days during which platinum and palladium prices were not being polluted by manipulation: June 26, 2007 and August 15, 2008.  DecisionII stated that "given how susceptible

prices on a *daily* basis (vs. an averaged longer term basis) are to multiple factors having nothing to do with the actions of JPMorgan, (*see, e.g*., Opp'n Mem. at 13-14), these allegations are insufficient to show price artificiality." SPA-48-49 Decision II [at 7-8n.4] (emphasis in original). *Compare* DecisionI at 25*with* SPA-DecisionII at 7-8n.4.

This reasoning was contrary to the Federal Judicial Center. Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed.) at p. 448 ("In cases when the news of the harm reaches the public discretely, say in a single day, the technique of an event study, commonly used in securities fraud cases, can be used to isolate the special component of the decline in market value."); see also, ***Anderson News***, 680 F.3d at 185.

Fifth, the Decision erroneously found and held that Defendants' positions supposedly could not be uneconomic or illegitimate because "the CFTC has twice initiated investigations into the alleged manipulation of the COMEX silver futures market and twice found that no such manipulation occurred." SPA-39, Decision I [at 39&n.11]. The Decision cited no authority for this proposition. None exists. The proposition is tantamount to saying that anything that exists, is proper unless the CFTC DE, which has an annual budget of $36 million to police the largest markets on earth, intervenes in the market to end the activity. Also, the very presence of these private actions could well cause prosecutorial discretion at the

CFTC to focus on LIBOR or its other huge investigation and implementation of Dodd-Frank (in which the CFTC must deal with JPMorgan).

Sixth, relatedly, the Decision failed to consider in the artificial price section, the significance of Plaintiffs detailed allegations that JPMorgan's positions were the opposite of what the CFTC found to be typical of a non-manipulating bullion dealer. They departed from such standard conduct in numerous ways that each pointed to manipulative conduct. *See* Facts *supra*.

Seventh, the Decision erroneously misapprehended that Plaintiffs alleged that the reduction in Defendants' concentration during March 25 – October 27, 2010 supposedly constituted a manipulative device. SPA-20-27,DecisionI [at 26-27]; SPA-50,DecisionII [at 9]. The Decision downgraded the plausibility of Plaintiffs' allegations because of a supposed failure to explain why this REDUCTION was a manipulative device. *Id.* Here, Plaintiffs were NOT alleging that the reduction in JPMorgan's concentration was a manipulative device. Just the opposite! Plaintiffs alleged that the reduction in JPMorgan's concentration was associated with the reduction in the artificiality as silver prices substantially outgained gold prices from the time of the CFTC hearing until the filing of the complaint.

Eighth, joining with the foregoing error, the Decisions failed to cite Plaintiffs' primary authority of *In re Sumitomo Copper Litig.,* 182 F.R.D. 85 (S.D.N.Y. 1998). In *Sumitomo*, Judge Pollack held that when the reduction in the manipulative position is followed by a significant reduction in prices, an inference of prior artificiality is appropriate. 182 F.R.D. at 87. Ninth, the Decisions erroneously made additional fact findings contrary to the complaint regarding price artificiality.

Thus, it was inappropriate and wholly unrealistic to require Plaintiffs to allege that COMEX silver prices were manipulated only if they deviated from London prices. Compare Facts ¶¶40-42 *with* SPA-45 DecisionII [at 4] (Complaint alleges that "COMEX prices …led London silver prices") *with id.* [at 8] (London Bullion Market "moved by magnitudes similar to those on the COMEX market"). Indeed, the CFTC has repeatedly warned that, at the trial stage, the cash-futures market in the same geographical market may be found **not** to be indicative of whether there is a manipulation. *In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,786, 1987 WL 106879, at *9 (CFTC Jul. 15, 1987) (quoting *Indiana Farm Bureau*, 1982 WL 30249, at *4, n.2). Much less should a geographically different market be imposed as the benchmark at the pleading stage.

54

5.    **In Multiple Independently Sufficient Ways, Plaintiffs Plausibly Allege JPMorgan's Causation Of Artificial Prices**

Causation in a CEA manipulation claim is ordinarily an issue that is inappropriate even for summary judgment.[19]  This Court has long held that "plaintiff is not required to prove that the defendant's act was the sole and exclusive cause of his injury; he need only show that it was 'substantial,' *i.e.*, a significant contributing cause." *Wilson v. Comtech Telecommunications Corp*., 648 F.2d 88,92 (2dCir.1981).  This applies as well to Plaintiffs' CEA manipulation claims. *E.g., Minpeco v.Hunt*, 718 F.Supp. 168, 173-74 (S.D.N.Y.1989) (a proximate cause or substantial factor is all that is required).

Here the Decisions found (and JPMorgan conceded) that JPMorgan had **the ability** to cause artificial prices.  SPA-19,DecisionI[at 19].  Therefore, the issue was whether Plaintiffs plausibly alleged that it was Morgan's **conceded ability** to move prices that did, in fact, cause the artificial prices that have been sufficiently alleged to exist.

---

[19] *Cargill v.Hardin*, 452 F.2d 1154, 1171-72 (8th Cir. 1971)(hearing established causation of artificial prices when shown that prices resulted from the conduct of a trader rather than from legitimate forces of supply and demand); *In re Soybean Futures Litig*., 892 F.Supp. 1025,1058 (N.D. Ill. 1995)("no difficulty" finding material fact issues precluding summary judgment as to causation); *Transnor (Bermuda) Ltd. v. BP North America Petroleum,*738 F.Supp. 1472,1488 (S.D.N.Y. 1990)(same);  *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989); *In re Kosuga,* 19 Agric. Dec. 603, 624 (U.S.D.A.1960)( "[i]t is enough, for purposes of a finding of manipulation in violation of sections 6(b) and 9[(a)(2)] of the [CEA] that respondents' action contributed to the price [movement]").

Plaintiffs plausibly alleged that Defendants' highly unusual actions, which were the opposite of a silver bullion dealer but like a manipulator in numerous respects, not only caused the silver gold ratio to decline by 40% during the Class Period compared to just before.  Also, as Defendants' degree of manipulative behavior increased and decreased during the Class Period, the degree of price artificiality increased and decreased.  .

These painstaking causation allegations suffice, at the pleading stage, under Rule 8(a) to give rise to a reasonable inference that it was Defendants' manipulative conduct that caused the artificially low COMEX silver futures prices and the substantial fluctuations therein.

Plaintiffs plausibly alleged that the price movements on June 26, 2007 and August 14-15, 2008 were contrary to the movement of prices in an ordinary competitive market, market fundamentals, news flow, and any non-manipulative explanations.  These large price movements had to be caused by someone acting as a large trader. *Id*. Plaintiffs plausibly alleged that Defendants' large trades and unusual conduct were precisely such a proximate cause or substantial factor in bringing about such large declines.

First, the Decisions erroneously found that Plaintiffs' causation allegations were insufficient because they lacked "corroborating factual allegations as to

trades, sworn affidavits, or other evidence." SPA-30. This was an erroneous summary judgment standard.

Second, the Decision also required specific allegations as to the amount and timing of certain trades. However, this was incorrect. *Wilamowsky v. Take-Two Interactive Software, Inc.* held that, while the "question of whether Rule 9(b) applies to loss causation has not yet been definitively addressed by the Second Circuit… the vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8." 818 F.Supp.2d 744,753n. 7 (S.D.N.Y. Sep. 30, 2011)(collecting cases).

Third, the Decision erroneously found that the CFTC "considered the trades made on June 26, 2007 and determined that the market was free of manipulation at that time." SPA-31, citing JA-193, Davidoff Decl. Ex. B [at 1]. No such statement appears in the cited CFTC Report. The CFTC Report does not analyze or express consideration of individual trading days.

Fourth, the Decision erroneously found that allegations at JA-277-79,¶¶ 55,58 as to large number of buy and sell orders "indicates no more than normal, rational market participation by JPMorgan, SPA-31. The Decision overlooked the allegation that "Marcus Elias also executed sell orders on behalf of JPMorgan in

the morning, **which contributed to the price declines**,[20] and then purchased

futures on behalf of JPMorgan subsequently as the market bottomed."  JA-279,¶58

(emphasis supplied).

Fifth, DecisionII erroneously severed the ability to influence prices from

causation of price artificiality. It did so with respect to allegations of "the existence

of a large concentration" of short positions in the COMEX silver futures market,

and that JPMorgan "'intentionally maintain[ed] a high short concentration in

COMEX silver futures' in order to depress" prices. SPA-44-45,DecisionII [at 3-4].

The Decision erroneously found that these allegations MERELY "speak to whether

it is plausible that JPMorgan had the ability to influence prices in the COMEX

silver futures market—a factual allegation which JPMorgan has not disputed." *Id*.

By stuffing these allegations into only one discrete element of CEA manipulation

claims and then finding that they must not have any probative value for the other

elements, the Decision erred.

The Decision also committed the errors recounted under artificial prices.

## B.    Plaintiffs Plausibly Pleaded A Claim For Aiding And Abetting Manipulation

---

[20]  The Decision twice omitted the phrase "which contributed to the price
declines," in its quotation of this allegation.  SPA-10,21-22.

Aiding and abetting requires allegations that Defendant (1) had knowledge of the principal's intent to manipulate in violation of the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the "principal's objective." SPA-34.  All three elements are inferable from surrounding facts and circumstances.  *See In re Lincolnwood Commodities*, Comm. Fut. L. Rep. (CCH) ¶ 21,986, at 28,254, 1984 WL 48104 (C.F.T.C.1984).

The Decision held that Plaintiffs had failed to state a primary liability claim and to identify the persons alleged to have been involved. SPA-34-35.

Without discovery, Plaintiffs identified four affiliated JPMorgan Defendants as Futures Commission Merchants,[21] a London Bullion dealer,[22] and a supervisor /employer of silver traders,[23] as well as two silver traders.  Plaintiffs alleged that each Defendant was involved in the COMEX silver transactions (JA-248-49,274-75,277-79,293,307-08,325-26,¶¶1(b), 46-47, 55-58, 65,88-89,91-93,122), each knew what their affiliates were doing (JA-374-75,¶¶204-205), and each intended to further one another's manipulation.  *Id*.  Each is liable under the CEA as a principal, a primary violator or an aider and abettor.[24]

---

[21] J.P. Morgan Clearing Corp. and J.P. Morgan Futures Inc. are registered FCMs. JA-265,¶¶23,25.

[22] JPMorgan Chase & Co. is a member of the London Bullion Market Association. JA-265,349-50,¶¶ 22,156,160.

[23] J.P. Morgan Securities Inc. provided futures clearing.  JA-265,¶24.

[24] The CEA provides an express private action for aiding and abetting in §22, 7 U.S.C. §25, and provides in §2(a)(1), 7 U.S.C. § 4, for strict secondary liability.

**C.    Plaintiffs Plausibly Alleged Sherman Act Section 1 And 2 Claims**

**1. Section 1 Claim**

"In order to state a cause of action under section one, plaintiff simply needs to allege that there was a contract or combination and that contract or combination resulted in an unreasonable restraint of trade." *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F.Supp. 81, 92 (S.D.N.Y. 1995).

The Complaint plausibly alleged concerted action by JPMorgan and an identified floor broker, and unidentified other floor brokers, in furtherance of their participation in a contract, combination or conspiracy to manipulate and suppress the prices of silver futures and options contracts traded on the COMEX, in violation of §1 of the Sherman Act, 15 U.S.C. §1. *E.g.*: JA-254-55,266,278-94,311-28,¶5,27,56-67,110-28 (large volume uneconomic trades in compressed period); JA-327,348-65,369,¶¶123-24,126,150,153-54,157-74,190(price signaling). [25]

The Decision held the allegations insufficient.  SPA-35-38.

Plaintiffs are not required at the pleading stage to specify the "who, what, when, where and how" of a defendant's Sherman Act violation.  *Polyurethane*

---

*Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999); *Cange*, 826 F.2d at 589; *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986).
[25] *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1110 (N.D. Cal. 2008).

*Foam Litig*, 799 F. Supp. 2d 777, 794 (N.D. Ohio 2011).  Nor are Plaintiffs required to allege that each party to a contract, combination or conspiracy possessed an anticompetitive intent.   *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670 (7th Cir. 1985), *cert. denied*, 475 U.S. 1129 (1986).

Courts have upheld antitrust claims alleging anticompetitive impact on commodity prices. *E.g.*, *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985).

## 2. Section 2 Claim

The Complaint also plausibly alleged a monopolization claim under § 2 of the Sherman Act, 15 U.S.C. § 2.  To state a monopolization claim, Plaintiffs need only allege:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power.  SPA-51. Decision II held the allegations insufficient for failure to demonstrate large enough market share to constitute a monopoly, that JPMorgan's COMEX transactions were not legitimate, and further that amendment not be allowed "at this late stage of the litigation." SPA-52.

But where a plaintiff alleges an actual adverse effect on competition, it need not demonstrate market share in order to prove the existence of monopoly power. *See Todd v. Exxon Corp.*, 275 F.3d 191, 197 (2d Cir. 2001).  JPMorgan did not

dispute that it had the ability to manipulate the market, *i.e.*, control prices and exclude competition for COMEX silver contracts.  SPA-19.

Courts have upheld antitrust claims alleging anticompetitive impact on commodity prices. *E.g*., *Blanchard Co., Inc. v. Barrick Gold Corp.*, 2003 WL 22071173 (E.D. La 2003).

Decision II further held that Plaintiffs had "failed to explain why they should be entitled to add this Section 2 Claim at this late stage in the litigation," but it made no finding of any undue prejudice. SPA-52.  Plaintiffs respectfully assert that no such prejudice exists at this stage.

## CONCLUSION

The Decisions must be reversed and Plaintiffs claims reinstated.


Dated:    New York, New York
          September 5, 2013


**LOVELL STEWART HALEBIAN
JACOBSON LLP**


By:  /s/ Christopher Lovell
Christopher Lovell
Gary S. Jacobson
Ben Jaccarino
Amanda N. Miller
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

(212) 719-4677 (fax)

*Attorneys for Plaintiffs-Appellants*
*Interim Lead Class Counsel*

**ROBINS, KAPLAN, MILLER & CIRESI LLP**
Bernard Persky
Hollis Salzman
Kellie Lerner
William V. Reiss
601 Lexington Ave., Ste. 3400
New York, New York 10022
(212) 980-74000

**LOWEY DANNENBERG COHEN & HART, P.C.**
Geoffrey Horn
Vincent Briganti
One North Broadway
White Plains Plaza, 5th Floor
New York, New York 10601
(914) 997-0500

**HAUSFELD LLP**
William Butterfield
Ralph Bunche
1700 K Street N.W., Suite 650
Washington, D.C. 20006
(202) 540-7200

**COHEN MILSTEIN SELLERS & TOLL PLLC**
J. Douglas Richards
Michael Eisenkraft
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

*Member, Interim Plaintiffs' Steering Committee*
*Attorneys for Plaintiffs-Appellants*

**KIRBY McINERNEY LLP**
David Kovel
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: 212.317.2300

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 8th Avenue, Suite 3300
Seattle, WA 98101
(206) 623-7292

Michael M. Buchman
**POMERANTZ HAUDEK GROSSMAN &
GROSS LLP**
100 Park Avenue, 26th Floor
New York, NY 10017
(212) 661-1100

Robert Kaplan
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Samuel J. Lieberman
**SADIS & GOLDBERG LLP**
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164

Linda Nussbaum
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis MN  55401
612-339-6900

Robert S. Schachter
Stephen L. Brodsky
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY  10010
(800) 721-3900

Jeffrey A. Klafter
**KLAFTER, OLSEN & LESSER, LLP**
Two International Drive, Ste. 350
Rye Brook, New York 10573
(914) 934-9220

Louis F. Burke
**Louis F. Burke P.C.**
460 Park Avenue, 21st Floor
New York, New York 10022

Bruce L. Simon
George S. Trevor
**PEARSON SIMON WARSHAW PENNY, LLP**
44 Montgomery St., Suite 2450
San Francisco, California 94104
(415) 433-9000

Peggy J. Wedgworth
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, New York 10119

Jeffrey Squire
**BRAGAR WEXLER EAGEL & SQUIRE**
885 Third Avenue, Ste. 3040
New York, New York 10022

*Additional Plaintiffs' Counsel*

**Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

I certify that this brief complies with the type-volume limitations of

F.R.App.P. 32(a)(7)(B), because:

(1)     this brief contains 13,352 words, excluding the parts of the brief
exempted by F.R.App.P. 32(a)(7)(B)(iii); and

(2)     this brief complies with the typeface requirements of F.R.App.P.
32(a)(5) and the type style requirements of F.R.App.P. 32(a)(6)
because this brief has been prepared in a proportionately spaced
typeface using Microsoft Word 2010 in 14 point Times New Roman
font.


Dated:  September 5, 2013




_____/s/ Christopher Lovell_____

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order Granting Defendants' Motion to Dismiss
Plaintiffs' Consolidated Class Action Complaint, and Denying
Plaintiffs' Motion to Compel Limited Discovery,
dated December 21, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA- 1

Opinion and Order Denying Plaintiffs' Motion for Leave to File
Amended Complaint Consolidated Class Action Complaint and
Dismissing Action, dated March 18, 2013 . . . . . . . . . . . . . . . . . . . . . . SPA- 42

Clerk's Judgment That for the Reasons Stated in the Court's Opinion
and Order, dated March 15, 2013, Plaintiffs' Motion to File an
Amended Consolidated Class Action Complaint is Denied and
Action Dismissed, dated March 25, 2013 . . . . . . . . . . . . . . . . . . . . . . . SPA- 54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                        :
IN RE COMMODITY EXCHANGE, INC.,    :          11 Md. 2213 (RPP)
SILVER FUTURES AND                 :
OPTIONS TRADING LITIGATION         :          **OPINION & ORDER**
                                                        :
-------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On September 12, 2011, Plaintiffs filed a consolidated class action complaint ("the

Complaint") claiming that Defendants J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp.,

J.P. Morgan Securities Inc., and J.P. Morgan Futures Inc. (together, "JPMorgan" or the

"JPMorgan Group Defendants"), as well as twenty unnamed "John Doe" Defendants

(collectively, "Defendants"), violated Sections 9(a) and 22(a) of the Commodity Exchange Act,

7 U.S.C. §§ 13(a), 25(a), and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  (Compl. ¶¶

1-2, 22-29, 199-210, ECF No. 85.)  The Complaint alleges that Defendants violated these acts by

combining, conspiring, and agreeing to manipulate the prices of silver futures and silver options

contracts traded on the Commodity Exchange Inc. ("COMEX") on June 26, 2007 and also

between March 17, 2008 and October 27, 2010 (together, the "Class Period").  (Id. ¶ 1.)  The

Complaint further alleges that, as a result of Defendants' unlawful conduct, Plaintiffs, a

proposed class of individuals who transacted in COMEX silver futures and options contracts

during the Class Period, "lost money and were injured in their property."  (Id. ¶ 21.)

On December 12, 2011, the JPMorgan Group Defendants filed a motion to dismiss the

Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Defs. Mot. to

Dismiss, ECF No. 91.)  While argument was pending on the motion to dismiss, Plaintiffs filed a

motion to compel limited discovery on April 17, 2012.  (Pls. Mot. to Compel Ltd. Disc. ("Mot.

1

to Compel"), ECF No. 104.)  For the reasons stated below, the motion to dismiss is GRANTED

and the motion to compel is DENIED.

## I.    FACTS ALLEGED IN THE COMPLAINT[1]

### A.    COMEX Silver Futures Contracts

A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date

in the future.  (Compl. ¶ 34.)  Market participants may trade silver futures contracts on COMEX,

a centralized market division for the trade of various precious metals in the New York

Mercantile Exchange ("NYMEX").  (Id. ¶¶ 31-32.)  For trading purposes, COMEX specifies the

trading units, price quotations, trading hours, and trading months, as well as the minimum and

maximum price fluctuations and margin requirements.  (Id.)  COMEX also provides

standardized futures contracts with delivery dates that fall within the month that a futures

contract is executed; the two calendar months thereafter; any January, March, May, or

September occurring within twenty-three months of the execution month; or, any July or

December occurring within sixty months of the execution month.  (Id. ¶ 33.)  Typically, "[t]he

---

[1]On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court's consideration "is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken." Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993).  The Court therefore presumes the truth of the factual allegations set forth in the Complaint, wherein Plaintiffs state that they "complain, on knowledge as to their own conduct, of Defendants." (Compl. at 1.)  In a footnote, Plaintiffs further explain:

Plaintiffs' information supporting their allegations made on information and belief include: (a) reports of statements by [CFTC] Commissioner Bart Chilton that the silver market has been and is being manipulated; (b) public news reports about the investigation by the CFTC of manipulation in the silver market; (c) news reports of JPMorgan's recent decision to close trading operations; (d) reports showing the recent reduction in the concentration of open interest in the silver futures contracts held by commercial firms; (e) reports of silver and gold prices and silver futures and silver options prices; (f) reports of trading activity, open interest and other aspects of silver futures, and silver options trading; (g) webcasts and statements of the March 25, 2010 Meeting of the CFTC to Examine Futures and Options Trading in the Metal Markets; (h) the following public reports: CFTC Commitment of Traders Reports; CFTC Bank Participation Reports; Bank for International Settlements OTC Derivatives Market Reports; Comptroller of the Currency Quarterly Reports On Bank Trading and Derivatives Actions; and the CFTC May 13, 2008 "Report on Large Short Trader Activity in the Silver Futures Market," and (i) other investigation including that reflected in specific allegations.

(Id. at 1 n.1.)

'soonest' two expirations are referred to as the 'front' months, and [these months] are the most actively traded."  (Id.)

At any given time, participants in the silver futures market are generally split evenly between "long position holders" (buyers who must take delivery of physical silver at contract expiration) and "short position holders" (sellers who must make the delivery at contract expiration).  (Id.  ¶¶ 30, 35.)  Only a small percentage of silver futures contracts, however, result in "delivery" (the consummation of the contract by physical exchange between a buyer and a seller).  (Id. ¶¶ 30, 36.)  Rather, traders generally "offset" their futures positions before a futures contract matures by purchasing or selling an equal number of futures contracts prior to maturation.  (Id. ¶ 36.)  A trader's realized profit or loss is quantified as the difference between the initial purchase or sale price and the price of the offsetting transaction.  (Id.)

### B.    Silver Futures Options Contracts

Silver traders may also offset futures positions by purchasing a silver futures options contract, which gives a purchaser the right, but not the obligation, to buy or sell a security at a specified price (the "strike price") on or before a specified date (the "options expiry").  (Compl. ¶¶ 37-42.)  Two types of COMEX silver options contracts exist: "calls" and "puts."  (Id. ¶ 37.) Call options are usually purchased when a buyer expects the prevailing price of silver to rise, while put options are usually purchased when a buyer expects the prevailing price to fall.  (Id.) In order to keep an option open, the buyer of an option contract may pay the seller of the option an "option premium."  (Id.)

At expiry, options will either be "out-of-the-money" or "in-the-money."  (Id. ¶¶ 37-43.) A call option will be out-of-the-money when the prevailing price of silver is less than the call option strike price.  (Id.)  In such a situation, the holder of the call option has no economic

incentive to buy silver futures contracts at a strike price higher than the prevailing market price,

and the seller of the call option benefits by getting to keep the option premium. (Id.) The holder

of a call option would, however, have an economic incentive to exercise his option to buy silver

futures contracts if the prevailing price of silver exceeds the call option strike price. (Id.) In that

situation, the call option would be in-the-money and the seller of the call option would be

responsible for covering the difference between the strike price and the prevailing market price.

(Id.) The opposite conditions apply to put options. An in-the-money put option occurs when the

prevailing price of silver falls short the call option strike price. (Id. ¶ 41.) When this situation

arises, the holder of the put option will likely exercise his right to sell the silver futures contract

at a strike price that is higher than the prevailing market price. (Id.) Conversely, when the

prevailing price of silver exceeds the call option strike price, the put option would be out-of-the-

money.[2] (Id.)

In order to value options, traders often use the Black-Sholes Pricing Model. (Id. ¶ 44-

45.) This model is described as:

> [A] formula that creates a "delta," which estimates the equivalent
> futures position for an options portfolio. An option that is well in
> the money close to expiration will have a delta of approximately 1
> for a call or negative 1 for a put, meaning that owning the option is
> equivalent to being long 1 futures contract for the call or short 1
> futures contract for the put. Likewise, an option that is far out of
> the money close to expiration will have a delta of approximately 0,

---

[2]An example may help to elucidate this otherwise esoteric subject. Let us posit that the price of silver currently
stands at $100 per ounce. Entity X, who expects prices of silver to fall, purchases a put option from Entity Y for $5
(the "option premium"), allowing X to sell one ounce of silver to Y for $100 (the "strike price") on December 31,
2012 (the "options expiry"). If, on December 31, 2012, the price of silver has fallen to $50 per ounce, the put option
is in-the-money, and X will exercise his put option to sell one ounce of silver to Y for $100. This will result in a loss
of $45 for Y, who otherwise would have been able to buy the ounce of silver for $50 on the market (remember Y
received the $5 option premium). However, if on December 31, 2012, the price of silver has risen to $150 per
ounce, the put option is out-of-the-money, and X will not exercise it; instead, he will sell the ounce of silver on the
market for $150. This will result in a $5 profit for Y, due to the option premium. (See, e.g., Compl. ¶ 43.)

4

> because it is unlikely that the option [will] move to an
> in-the-money position.
>
> As an option nears a point of being in the money, the delta of the
> option approaches 0.5. Many option traders use the measure of
> delta expressed in the Black-Sholes type models to hedge their
> delta exposure. This means that if they hold many options, even if
> the delta is substantially less than one (and the option is out of the
> money), they may need to sell or buy futures to hedge their delta
> exposure. So, for example, if a trader is short 100
> out-of-the-money puts whose delta is 0.25, in order to be "delta
> neutral," the trader must sell 25 futures contracts.

(Id.)

## C. The Commodity Futures Trading Commission

In 1974, Congress established the Commodity Futures Trading Commission (the

"CFTC") as an independent government agency to regulate commodity futures and option

markets in the United States. See 7 U.S.C. § 1 et seq. The CFTC is charged with protecting

market users and the public from fraud, manipulation, and abusive practices in the commodity

futures marketplace. Id. Should the CFTC suspect an attempted or perfected manipulation of

the silver futures market, the CFTC has broad authority to investigate and, if appropriate, to

pursue enforcement actions. Id. §§ 7, 13(a)(2).

In 2004, the CFTC began receiving complaints that large commercial traders were

manipulating the silver futures market. (See Defs. Mem. in Supp. of Mot. to Dismiss ("Defs.

Mem.") at 2-4, ECF No. 92.) The CFTC summarized the general nature of these allegations as

follows:

> With silver consumption exceeding new production for many
> years, it is generally acknowledged that the production deficit has
> been primarily filled by a drawdown of stocks. Some argue that
> this decline in silver stocks cannot persist and, since stocks have
> fallen to low levels, silver prices should have been rising sharply.
> There is further conjecture that, over the past 20 years, a group of

> commercial traders . . . have held short futures positions that are so
> large that they cannot serve legitimate hedging purposes because
> they cannot be backed by real silver. These traders have allegedly
> used these "naked" short positions to downwardly manipulate the
> price of silver. Moreover, the argument goes, this alleged
> 20-year-long manipulation of the silver market has created the
> conditions ripe for a huge price spike because stocks have reached
> dangerously low levels.

(Decl. of Amanda F. Davidoff in Supp. of Defs.' Mot. to Dismiss ("Davidoff Decl."), Ex. A

("May 14, 2004 CFTC Letter to Silver Investors") at 1-2, Dec. 12, 2011, ECF No. 90.)

In response to these complaints, the CFTC launched an investigation.  The results of the

investigation led the CFTC to conclude that the allegations of manipulation were unsupported

and "lack[ing] a coherent explanation of how such a manipulation could [have] occur[ed], or a

plausible explanation for a motive."  (Id. at 5.)  This conclusion notwithstanding, between 2005

and 2007, the CFTC received numerous new complaints that the silver futures market was being

manipulated downward.  (See Davidoff Decl., Ex. B ("May 13, 2008 CFTC Report on Large

Short Trader Activity in the Silver Futures Market") at 1.)  The CFTC investigated, but in a May

2008 report announced that it had again found "no evidence of manipulation in the silver futures

market."  (Id.)

The CFTC launched a third investigation into claims that the silver futures market was

being manipulated in late 2008.  (Compl. ¶ 7.)  On March 25, 2010, the CFTC held a public

meeting to "examine futures and options trading in the metals markets."  (Id. ¶¶ 175.)  It was not

until October 26, 2010, however, that CFTC Commissioner Bart Chilton publically announced

the existence of the investigation which had begun in late 2008.  (Id. ¶ 7(c).)  In so doing, the

Commissioner commented that he believed there had been repeated, fraudulent efforts "to

persuade and deviously control" prices in the silver markets.  (Id.)  The day after the

6

Commissioner's announcement, the first of the complaints later consolidated in this class action was filed.[3]  Since launching the investigation in 2008, the CFTC has engaged in discovery, but it is noted that the CFTC has yet to file a complaint against any party in the market manipulation that the Commissioner announced to be going on.  (See Status Conference Hr'g Tr. ("2/25/11 Tr.") 52-53, Feb. 25, 2011; see also Defs. Mem. at 4.)

## II.    CONSOLIDATED CLASS ACTION COMPLAINT

On September 12, 2011, Plaintiffs filed this consolidated class action Complaint alleging that (1) Defendants[4] manipulated the prices of COMEX silver futures and options contracts during the Class Period in violation of Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a), 25(a), (Compl. ¶¶ 199-202); (2) "JPMorgan knowingly aided, abetted, counseled, induced, and/or procured" the alleged violations of the Commodity Exchange Act in violation of Section 22(a)(1), 7 U.S.C. § 25(a)(1), (Compl. ¶¶ 203-05); and (3) JPMorgan entered "an agreement, understanding or concerted action between and among JPMorgan and the John Doe Defendants," and "[i]n furtherance of this agreement, JPMorgan fixed, maintained, suppressed and/or made artificial prices for COMEX silver futures and options contracts" in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, (Compl. ¶¶ 206-10).  The Complaint further alleges that Defendants accomplished their manipulation of the COMEX silver market using diverse means, including: "(a) a dominant and manipulative short position and market

---

[3]See, e.g., Beatty v. JPMorgan Chase & Co., et al., No. 10 CIV 08146 (S.D.N.Y. Oct. 27, 2010); Laskaris v. JPMorgan Chase & Co., et al., No. 10 CIV 08157 (S.D.N.Y. Oct. 27, 2010).  The Judicial Panel on Multidistrict Litigation consolidated all actions on Feb. 8, 2011.  (See Transfer Order, Feb. 8, 2011, ECF No. 1.)

[4]As stated supra, Defendants are the "JPMorgan Group Defendants" (J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc., and J.P. Morgan Futures Inc.) and twenty unnamed "John Doe" Defendants.  (Compl. ¶¶ 22-29.)

power manipulation; (b) repeated manipulative and uneconomic trades and trade manipulation; (c) false trades made to facilitate a trade manipulation; and (d) other acts."  (Compl. ¶ 2.)

### A.    Market Power Manipulation

The Complaint first alleges that, between March 17, 2008 and August 2008, JPMorgan "gradually acquired control" from Bear Stearns of COMEX silver futures and options totaling approximately 130 million ounces.  (Compl. ¶¶ 3(a), 69.)  By this large acquisition, in combination with JPMorgan's previously held COMEX short positions, it is alleged that JPMorgan acquired substantial market power in COMEX silver futures contracts.  (Id. ¶¶ 3, 68-87.)  Indeed, Plaintiffs claim that, by August 5, 2008, JPMorgan held "significantly more net short COMEX silver positions than the next three largest traders on COMEX combined."  (Id. ¶¶ 3(b), 79, 86.)  Plaintiffs also assert that, based on their analysis of CFTC Bank Participation Reports and a CFTC "Commitment of Traders" Report, "from August 5, 2008 forward, JPMorgan held approximately 20-30% of the total short open interest in **all** COMEX contracts."  (Id. ¶ 86 (emphasis in original).)  As JPMorgan acquired control of these large COMEX short positions, the Complaint alleges that the price of COMEX silver prices substantially decreased because "[b]y itself such a concentrated short position moved COMEX silver futures prices down."  (Id. ¶¶ 87, 3(c) (emphasis added).)  The Complaint further asserts that COMEX silver prices did not begin to rise until after the CFTC held its March 25, 2010 public hearing into the allegations that futures and options trading in the metals markets were being manipulated.  (Id. ¶ 3(d).)  After this date, the Complaint states, COMEX silver prices substantially outperformed COMEX gold prices.  (Id.)

B.    **Manipulative and Uneconomic Trades**

The Complaint next alleges that, during the Class Period, JPMorgan profited by using its dominant position in the silver futures market to make "large manipulative trades that repeatedly caused sudden, unreasonable and artificial fluctuations in COMEX silver prices." (Compl. ¶¶ 4(a), 46.) The Complaint describes these manipulative trading "episodes" as follows. (Id. ¶¶ 4, 55-58, 110-13.)

1.    Silver Futures Trading Activities of June 26, 2007

The Complaint alleges that according to one unidentified witness, on June 26, 2007—the date when options on the July 2007 silver futures contract expired—JPMorgan "purchased sizeable out-of-the-money puts in July 2007 futures between the strike prices of $12.75 and $12.00." (Id. ¶ 55.) The Complaint posits that JPMorgan made these purchases because it "knew that if silver future prices traded below these strike prices, [it] could reap a profit by exercising [its] options, i.e., selling the futures contract[s] at the higher strike price." (Id.) The Complaint also asserts that "JPMorgan intentionally drove the price of July 2007 silver futures lower through large volume trades and 'spoof orders'" placed "just above the price at which the market was trading." (Id. ¶ 56.) The "spoof orders" were allegedly never meant to be executed, but instead were meant to "provide a strong, deceptive signal that the market [wa]s head[ing] in a certain direction." (Id.) According to Plaintiffs:

> JPMorgan placed these large volume (spoof) sell orders for silver futures just above the price at which the market was trading. Those orders served as a ceiling or weight on the market that deceptively encouraged other traders to sell futures in the belief that the market was going to trade lower, because large sell orders implied some fundamental weakness in the market price.

(Id.)

9

Then, when the prices decreased on June 26, 2007 to a low of $12.15 per ounce, the

Complaint alleges, JPMorgan made a huge profit by exercising its put options and by purchasing

futures contracts from traders who were forced to cover their own short put positions to remain

"delta neutral." (Id. ¶ 57.)  Because, after trading closed on June 26, 2007, the prices for July

2007 futures allegedly "ceased to descend and trading stabilized," (id. ¶ 61), the Complaint

alleges that "[s]imply viewing the price movement of July futures . . . on June 26, 2007 provides

concrete evidence" that JPMorgan caused the July silver prices to move to artificially low level

levels, (id. ¶ 59.  The Complaint also alleges that, "[h]istorically, silver futures movements are

often correlated with gold price movements[, but on June 26, 2007, t]here was no new

information that came to market . . . that would have provided the catalyst for such a strong

downward move in price."  (Id. ¶ 60.)

In addition, Plaintiffs assert that JPMorgan executed its trades on June 26, 2007 through,

among others, a futures floor broker named Marcus Elias, who was "a former classmate and

wrestling teammate of Chris Jordan, a senior silver trader at JPMorgan."  (Id. ¶ 58.)  As alleged

in the Complaint, Elias acknowledges that, on June 26, 2007, "he executed purchase trades for

JPMorgan at or near the lows of the market" and also "executed sell orders on behalf of

JPMorgan in the morning . . . and then purchased futures on behalf of JP Morgan subsequently

as the market bottomed."  (Id.)

2.  Silver Futures Trading Activities on August 14-15, 2008

The Complaint next alleges that JPMorgan's 2008 acquisition of the 130 million ounces

in silver futures and options previously held by Bear Stearns gave JPMorgan an even greater

financial incentive to manipulate the prices of silver futures on August 14-15, 2008, which was

just before the expiration of the September 2008 silver futures contracts.  (Id. ¶¶ 68-69, 110-11.)

Specifically, the Complaint states:

> On August 15, 2008, from the previous trading day's settlement
> price for September 2008 silver futures of $14.23, the price of this
> futures contract traded down to a low of $12.72 and settled at
> $12.815.  In percentage terms, that was a decline of approximately
> 12% in one day, which is extremely large.

(Id. ¶ 112.)  According to an unidentified witness, this "price movement occurred because

JPMorgan used its massive selling power and spoof orders to move the market lower and to

force the traders who were short those options to cover their positions."  (Id.)  The Complaint

also alleges that JPMorgan was involved in these trades because, "without any new information

coming to the silver market,"  (id. ¶ 115), "[t]he trade volume for September futures during [the]

August 15, 2008 trading period was 43% higher than the highest of the five days leading up to it,

and 74% higher than the highest of the subsequent five days," (id. ¶ 114)  Finally, it is alleged

that Chris Jordan (the same JPMorgan senior silver trader who formerly wrestled with Marcus

Elias) was "selling back large amounts of September put options at an enormous profit."  (Id. ¶

118.)

      3.  Allegations of Additional Uneconomic Trades

In addition to the manipulative trades made on June 26, 2007 and on August 14-15, 2008,

the Complaint alleges that JPMorgan used its dominant COMEX short position to bring about

trades that were "inconsistent with trying to obtain the best sales price execution, but consistent

with trying to move prices down by aggressively selling in a compressed period to receive less

on the sales transactions."  (Id. ¶ 121; see also id. ¶¶ 5-6, 96-109.)  In support of this allegation,

the Complaint discusses instances of unexpected "heavy selling" which occurred between April

2009 and August 2010.  (Id. ¶¶ 121-23.)  These instances were allegedly brought to the attention

11

of the CFTC Commissioner by an unidentified "market professional . . . registered with the

National Futures Association," who was "a long time participant in the COMEX silver futures

markets." (Id. ¶ 122.) An unnamed "whistleblower"[5] also allegedly contacted the CFTC on

February 3, 2010 to report that JPMorgan would be making an unidentified "signal . . . indicating

its intent to depress COMEX silver futures and options contracts two days later." (Id. ¶ 125.)

On February 5, 2010, this whistleblower contacted the CFTC "to confirm that the silver

manipulation was a great success and [had] played out EXACTLY as predicted." (Id. ¶ 126.)

      **C.**      **False Trades Made to Facilitate a Trade Manipulation**

      Finally, the Complaint alleges that JPMorgan conspired with others to manipulate a

pricing platform operated by Saxo Bank, a Danish investment bank. (Compl. ¶¶ 138-39.)

According to the Complaint, the Saxo Bank pricing platform provides clients of Saxo Bank,

along with those who have "special access" to the platform, aggregated information on the

trading price of silver. (Id. ¶¶ 8-10, 157-58, 161.) The Complaint explains that Deutsche Bank

and JPMorgan are two of the banks which provide pricing data to Saxo Bank and that, as of

January 28, 2008, Saxo Bank and JPMorgan had entered into "a prime broker agreement" that

gave the bank's clients "access to greater liquidity and increased accuracy of trading data for

their currency pair operations." (Id. ¶ 161.) The Complaint also states that two

individuals—Albert Maasland and Steven Bellamy— worked at Saxo Bank and had previously

worked for JPMorgan. (Id. ¶¶ 149, 152.)

      The Complaint then alleges that, "[d]uring the Class Period, between 5:45 p.m. and 6

p.m. (traditionally a period of very low trading volume during the twenty-four hour silver trading

---

[5]It is unclear from the Complaint if the unnamed "market professional" registered with the National Futures Association is the unnamed "whistleblower." (Compare Compl. ¶¶ 124-25 with id. ¶ 122.)

day), a false trade appeared more than twenty-five times on Saxo Bank's pricing platform." (Id. ¶¶ 10, 162.) The Complaint states that each allegedly false trade was always followed by a "highly unusual" and very brief "violent drop down in price that caused COMEX prices to be lower than they otherwise would have been." (Id. ¶¶ 10-12, 162-63.) These false trades are asserted to be a "signal" after which followed "a sharp decline of a comparable dimension in the prices of COMEX silver futures contracts." (Id. ¶ 163.) To illustrate this pattern of illegal activity, the Complaint includes a list of allegedly fake trades that occurred on April 1-2, 2008; April 3-4, 2008; June 18-19, 2008; June 25-15, 2008, May 17-18, 2009; June 9-10, 2009; January 11-12, 2010; March 8-9, 2010. (Id. ¶¶ 166-74.)

### III.    PROCEDURAL HISTORY

#### A.    Motion to Dismiss

On December 12, 2011, Defendants filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (See Defs. Mot. to Dismiss, ECF No. 91; Defs. Mem. in Supp. of Mot. to Dismiss ("Defs. Mem."), ECF No. 92.) On February 14, 2012, Plaintiffs filed a memorandum of law in opposition to the motion to dismiss. (Pls. Mem. of Law in Opp'n to Mot. to Dismiss ("Pls. Mem."), ECF No. 97.) Defendants filed their memorandum in reply on March 27, 2012. (Defs. Reply Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Reply Mem."), ECF No. 102.)

#### B.    Motion to Compel Limited Discovery

On February 25, 2011, Plaintiffs served Defendants with a request for production of documents. (See Aff. of Ian T. Stoll in Supp. of Mot. to Compel ("Stoll Aff.") Ex. D, April 18, 2012, ECF No. 106.) JPMorgan timely objected, arguing that Plaintiffs' requests were premature, overly-broad, unduly burdensome, and protected by attorney-client privilege and by

the work product doctrine.  (See Stoll Aff. Ex. E.)  More than one year later, on April 18, 2012,

Plaintiffs filed a motion to compel requesting (1) discovery of all documents produced by

JPMorgan to the CFTC during the CFTC's investigation of silver futures contracts and (2) an

order that the parties confer pursuant to Rule 26(f) so that Plaintiffs could request "the basic

documents reflecting [JP]Morgan's COMEX silver futures transactions and related conduct to

any extent such documents were not contained in [JP]Morgan's production to the CFTC."  (Pls.

Mem. in Supp. of Mot. to Compel ("Pls. Compel Mem.") at 1-2, ECF No. 105.)  On May 9,

2012, Defendants filed a memorandum of law in opposition to the motion to compel, (Defs.

Mem. in Opp'n to Mot. to Compel, ECF No. 110), and on May 18, 2012, Plaintiffs filed a

memorandum in reply, (Pls. Reply Mem. in Supp. of Mot. to Compel, ECF No. 112).

**C.     Oral Argument**

On May 16, 2012, the Court held oral argument on Defendants' motion to dismiss.  After

the argument, Plaintiffs sent the Court a letter seeking "to supplement an answer to [the Court's]

questioning during oral argument" and "to respond to certain statements by Defendants during

the reply portion of their oral argument."  (Letter from Pls. to the Court, May 17, 2012).  In

response, Defendants sent a letter characterizing Plaintiffs' May 17 Letter as "tantamount to an

improper sur-reply."  (Letter from Defs. to the Court, May 21, 2012.)  On May 22, 2012, the

Court received another letter from Plaintiffs responding "to two points in [Defendants'] May 18

letter," but neglecting to address Defendants' contention that Plaintiffs' May 17 letter constituted

an improper sur-reply.  (Letter from Pls. to the Court, May 22, 2012.)  Defendants responded

"briefly to two inaccuracies in Plaintiffs' second sur-reply" in a letter dated May 23, 2012.

(Letter from Defs. to the Court, May 23, 2012.)  The Court, in an Order dated May 23, 2012,

then ruled:

14

> While Plaintiffs did seek leave at oral argument to respond to certain of the Court's questions by letter, (see Tr. of May 16, 2012 Oral Arg. at 79), the substance of Plaintiffs' May 17 letter does exceed the scope of that request. Still, in view of the fact that Defendants have had an adequate opportunity to respond to Plaintiffs' letters, the Court will accept and consider the correspondence of the parties that has been submitted to this point. No further correspondence will be accepted.

(Order, May 23, 2012, ECF No. 117.)

## IV.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). In considering whether a plaintiff has "nudged [his] claim across the line from conceivable to plausible," id., a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the complainant, Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008); see also supra n.1. "Nevertheless, the court need not accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness." In re Amaranth Natural Gas Commodities Litig. ("Amaranth I"), 587 F. Supp. 2d 513, 528 (S.D.N.Y. 2008) (internal quotation marks and alterations omitted); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that 'tenet' is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (internal quotation marks and citations omitted).

## V.    DISCUSSION

Defendants argue that Plaintiffs' Complaint should be dismissed because Plaintiffs fail to allege with the particularity required under Rule 9(b) of the Federal Rules of Civil Procedure that

15

JPMorgan violated the Commodity Exchange Act by manipulating, or by assisting anyone else

to manipulate, prices in the COMEX silver futures market.  (See Defs. Mem. at 6-7.)

Defendants contend that the Complaint contains nothing more than generalized allegations of

market conditions and "simply describe[s] how the COMEX market could be manipulated by

trading near options expiration, allege[s] that JPMorgan held a large market position, compare[s]

the price of silver with other commodities, and describe[s] market fluctuations and 'signals'

unconnected to JPMorgan."  (Defs. Mem. at 14 (internal citations omitted).)  Defendants also

argue that Plaintiffs' conclusory allegation that JPMorgan conspired with unnamed others

through unspecified means fails to allege a Sherman Antitrust Act conspiracy under the pleading

standards set forth in Twombly and its progeny.[6]  (See id.)  In response, Plaintiffs contend that

the pleading standard set forth in Rule 8(a), and not the standard in Rule 9(b), applies to their

Commodity Exchange Act manipulation claims.  (Pls. Mem. at 10-15.)  Moreover, Plaintiffs

argue that their Complaint satisfies both Rule 8(a)'s relaxed particularity pleading standard as

well as Rule 9(b)'s more stringent requirements.  (Id.)  Finally, Plaintiffs assert that Defendants

failed to meet their burden to show that the Sherman Antitrust Act claims were not adequately

pled.  (Id. at 32-34.)

---

[6]Defendants also argue that Plaintiffs' claims dating back to June 26, 2007 should be dismissed as time-barred
pursuant to the Commodity Exchange Act's two-year statute of limitations.  (See Defs. Mem. at 20-23 (discussing
7 U.S.C. § 25(c)).)  Defendants calculate that these claims are time-barred because Plaintiffs filed the first complaint
in this consolidated action on October 27, 2010.  (See id.)  Plaintiffs dispute this calculation and assert that
Defendants' fraudulent concealment of their allegedly unlawful activities should toll the applicable statute of
limitations period.  (See Pls. Mem. at 28-30.)  The Court declines to reach this issue at this time.  Where, as here, it
is unclear from the facts alleged in the Complaint that a plaintiff had, or should have had, "inquiry notice," a factual
dispute is raised that cannot be resolved at the motion to dismiss stage.  See In re Natural Gas Commodity Litig.,
337 F. Supp. 2d 498, 514 (S.D.N.Y. 2004); In re Sumitomo Copper Litig. ("Sumitomo II"), 120 F. Supp. 2d 328,
346-47 (S.D.N.Y. 2000); see also Premium Plus Partners, L.P. v. Davis, 2005 WL 711591, at *11-13 (N.D. Ill.
March 28, 2005).

A.    **Commodity Exchange Act Market Manipulation Claims**

1.  Pleading Standard to Show Elements of Market Manipulation

In cases involving alleged violations under the Commodity Exchange Act, "courts in this

district have applied a 'case-specific approach' to determine the applicable pleading standard by

examining whether the alleged manipulative scheme includes a fraud element." CFTC v.

Amaranth Advisors, L.L.C., 554 F. Supp. 2d 523, 538 (S.D.N.Y. 2008); see also CFTC v.

Parnon Energy, Inc., 2012 WL 1450443, at *9 (S.D.N.Y. April 26, 2012) (discussing "case-

specific approach").

Rule 9(b) requires that, when "alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also In re

Amaranth Natural Gas Commodities Litig. ("Amaranth I"), 587 F. Supp. 2d 513, 528-29

(S.D.N.Y. 2008) ("To comply with the requirements of Rule 9(b), a plaintiff alleging

manipulation must plead with particularity the nature, purpose, and effect of the fraudulent

conduct and the roles of the defendants.") (internal quotation marks omitted).  Defendants argue

that Plaintiffs' Complaint sounds in fraud because of the allegations claiming that Defendants

made "fake" trades and also provided "false signals" and "spoof orders" for the purpose of

misleading the market.  (Defs. Mem. at 13.)

Plaintiffs dispute this characterization of their Complaint and argue that, where, as here, a

commodities market manipulation claim is based on a particular trading strategy, the Rule 8(a)

pleading standard requiring only "a short and plain statement" should apply.  (Pls. Mem. at 12

(quoting Fed. R. Civ. P. 8(a)(2))); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (While

"[t]he plausibility standard is not akin to a probability requirement, . . . it asks for more than a

sheer possibility that a defendant has acted unlawfully.") (internal quotation marks and citation

17

omitted).  Plaintiffs further contend that their allegations of "false trades" are not the primary or

direct means by which they allege that Defendants manipulated prices in the silver futures

market, but rather were signals that Defendants used in furtherance of their manipulative trading

activitiy.  (Pls. Mem. at 12.)

Upon review of the allegations presented in the Complaint, the Court declines to make a

determination at this time as to which pleading standard should apply to Plaintiffs' claims.  See

In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 598 n.5 (S.D.N.Y. 2011)

(dismissing complaint because claims were not sufficient under either the Rule 8(a) or Rule 9(b)

pleading standard).  As the following analysis sets forth, even under Rule 8(a)'s more permissive

standard, the Complaint fails to plead factual allegations sufficient to allow the Court to draw

"the reasonable inference" that Defendants are liable for the misconduct alleged.  Cf. Iqbal, 556

U.S. at 678.  Rather, the Complaint merely pleads facts that could be "consistent with"

Defendants' liability and "stops short of the line between possibility and plausibility of

'entitlement to relief.'"  Id. (citing Twombly, 550 U.S. at 557).

2.  Elements of Market Manipulation

The Commodity Exchange Act prohibits any person  from "manipulat[ing] or

attempt[ing] to manipulate the price of any commodity."  7 U.S.C. § 13.  While the term

"manipulate" is undefined in the Act, "the CFTC and the courts have developed a four-factor test

to determine whether a defendant has manipulated prices."  See Platinum & Palladium,

828 F. Supp. 2d at 598 (internal alterations omitted).  A court thus considers whether (1) the

defendant possessed the ability to influence market prices; (2) the defendant specifically

intended to influence market prices; (3) the alleged artificial prices exist; and (4) the defendant

caused the artificial prices to exist.  See id.; see also In re Cox [1986-1987 Transfer Binder], No.

75–16, Comm. Fut. L. Rep. (CCH) ¶ 23,786, 1987 WL 106879, at *4 (CFTC July 15, 1987).

    3.  Analysis of Alleged Market Manipulation

        *(a) Ability to Influence Market Prices*

    The Complaint alleges that JPMorgan "frequently held large COMEX silver short

positions that were as large as the other three largest COMEX traders combined."  (Compl.

¶ 86.)  The Complaint also states that, "from August 5, 2008 forward, JPMorgan held

approximately 20-30% of the total short open interest in **all** COMEX contracts" and "32-40% or

more of the entire short open interest."  (Id. ¶ 86; see also id. ¶¶ 74-79.)  In light of these factual

allegations, it is plausible that JPMorgan had the ability to influence prices in the silver futures

market.  Cf. Parnon Energy, 2012 WL 1450443, at *10 (discussing the various ways a market

participant may influence market prices).  Moreover, JPMorgan declines to challenge that it

possessed the ability to influence market prices.  (See Reply Mem. at 6 n.8.)  On this basis, the

Complaint states sufficient factual allegations to plead the first element of Plaintiffs' market

manipulation claim.

        *(b) Intent to Influence Market Prices  –*

    To plead the specific intent element of a claim for manipulation under Rule 8(a), a

plaintiff must allege that a defendant "acted (or failed to act) with the purpose or conscious

object of causing or [a]ffecting a price or price trend in the market that did not reflect the

legitimate forces of supply and demand."  Parnon Energy, 2012 WL 1450443, at *14 (internal

quotation marks omitted).  Defendants contend that Plaintiffs fail to allege facts which give rise

to a "strong inference of scienter" and that Plaintiffs' allegations actually create a stronger

inference that JPMorgan was using its short interest in the silver market to hedge its long

position in physical silver bullion.  (Defs. Mem. at 16-19.)  Plaintiffs dispute these assertions,

arguing that JPMorgan's large financial incentive to manipulate the market, combined with

JPMorgan's "unusual behavior," "bragging" comments, and physical deliveries of silver, all are

"cohered with and explained by an intent to manipulate."  (Pls. Mem. at 22-26.)

      Plaintiffs' claims concluding that JPMorgan, as a large holder of COMEX silver futures

contracts, short puts, and options, possessed the intent to hedge its holdings and manipulate

market prices downward is not supported by sufficient factual allegations.  The Complaint relies

on the percentage of short positions that Plaintiffs presume JPMorgan held during the Class

Period and, given this large percentage, infers that Defendants must have had an intent to

manipulate silver prices on the COMEX market.  (See Compl. ¶¶ 3, 69-79, 86, 95, 112-15, 130-

37.)  The Complaint does not, however, include factual allegations showing that JPMorgan was

anything more than "fully aware" that "any sudden and unexpected decline in future prices

would cause option deltas to skyrocket . . . and send the sellers of far outside of the money puts

scrambling to sell futures."  (Id. ¶ 46.)  Rather, the Complaint asserts that, "[i]n such a selling

frenzy, JPMorgan would [have] be[en] able to purchase silver futures at prices far below what

they had been trading only hours, if not minutes, earlier."  (Id.)  But this conclusory and

speculative allegation, and the others like it, (see, e.g., id. ¶¶ 5, 43-45, 47, 51-54, 68-87, 96-109,

112-18, 137), are not supported by factual allegations showing that JPMorgan took specific

actions which exhibited an actual intent to bring about, engage in, or did bring about the so-

called "selling frenzy."  Cf. In re Rough Rice Commodity Litig., 2012 WL 473091, at *7 (N.D.

Ill. Feb. 9, 2012) ("Mere knowledge that certain actions might have an impact on the futures

market is not sufficient to state a private claim under the [Commodity Exchange Act].")

Indeed the Complaint is readily distinguishable from other cases where courts have applied the pleading standard under Rule 8(a) and found intent to manipulate to have been pled sufficiently.  In <u>Parnon Energy</u>, for example, the court inferred intent not only from the defendants' "trading activity following their awareness of the tight [crude oil] market," but also from the defendants' alleged conduct and contemporaneous communications discussing plans to execute a market manipulation strategy.  <u>See</u> 2012 WL 1450443, at *14-15.  Similarly, in <u>Amaranth Advisors</u>, the court drew the inference that defendants had acted with the intent to affect market prices because allegations in the complaint stated that the defendants exchanged "numerous instant message conversations" in which specific plans to drive up prices were discussed.  <u>See</u> 554 F. Supp. 2d at 532; <u>see also</u> <u>CFTC v. Enron Corp.</u>, 2004 WL 594752, at *7 (S.D. Tex. March 10, 2004) (inferring intent where a complaint alleged that a defendant had conducted certain trades to "bid up" the market,  made it known to other traders that he was "bidding up" the market, and enlisted another trader's assistance as part of the scheme).

The Complaint here, by contrast, includes no reference to specific communications between the Defendants about any specific plan to cause artificial prices or an artificial price trend in the silver futures market.[7]  Moreover, although Plaintiffs do allege a relationship between floor trader Marcus Elias and his former wrestling teammate, JPMorgan senior silver trader Chris Jordan, these two men are not named as defendants and nothing in the Complaint alleges that either acted with the intent to manipulate market prices.  (<u>Cf.</u> Compl. ¶¶ 57-58, 118.) Elias's acknowledgment that, on June 26, 2007, he "executed purchase trades for JPMorgan at or near the lows of the market," and also "executed sell orders on behalf of JPMorgan in the

---

[7]Indeed Plaintiffs fail to articulate any basis for naming as defendants the subsidiary companies that comprise the JPMorgan Group Defendants in this class action.

morning . . . and then purchased futures on behalf of JP Morgan subsequently as the market

bottomed," (id. ¶ 58), shows only that JPMorgan participated in trades on the COMEX silver

futures market during that day.  Without additional factual support, Elias's statement does not

give rise to the inference that he was acting with the intent of causing artificial price fluctuations

within the market—let alone acting at the instigation of JPMorgan—as opposed to responding to

market opportunities presented during the day.

     Plaintiffs next contend that intent can be inferred from the Complaint's allegation that,

"according to publicly available information, JPMorgan traders bragged . . . during the Class

Period about their large trades which successfully moved silver prices."  (Id.¶ 176; see also Pls.

Mem. at 24-25.)  But this generalized allegation does not state the date or the language of the

remarks deemed to be "bragging;" identify the traders who are alleged to have made these

remarks; discuss which of the many trades that took place over the more than two-and-a-half

year Class Period were the subject of the traders' bragging; or indicate that the traders were

acting at the instigation of JPMorgan to move silver prices on the market.  Thus, absent other

supporting factual allegations or affidavits, these statements are not factually sufficient to

"nudge" the Complaint "across the line" between the possibility that JPMorgan was acting with

an intent to manipulate COMEX silver futures prices and the plausibility that it was doing so.

Cf. Twombly, 550 U.S. at 570.

     Finally, Plaintiffs argue that intent can be inferred from JPMorgan's "unusual" deliveries

of silver between March 2008 and October 2010.  (Pls. Mem. at 24.)  In their opposition

memorandum, Plaintiffs cite multiple paragraphs for their position to show that JPMorgan made

such unusual deliveries, (see id. (citing Compl. ¶¶ 2-3, 5, 68-87, 130)), but only one of these

sections—Paragraph 130—actually alleges that, over the two-and-a-half year period between

March 17, 2008 and October 27, 2010, JPMorgan "ma[d]e deliveries on silver futures contracts which did depress prices."  (Compl. ¶ 130.)  This allegation, without additional factual allegations as to the volume or timing of a delivery, cannot support Plaintiffs' claim that JPMorgan used deliveries to create an illegitimate supply factor.  Indeed Plaintiffs themselves acknowledge that a "small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery."  (Id. ¶ 36.)  Moreover, as the CFTC explained in its 2004 Report, "commercial firms may legally hold futures positions for hedging or speculative purposes.  The mere holding of speculative positions by either commercial or non-commercials is neither a violation of the CFTC or NYMEX rules, nor evidence of manipulation."  (Davidoff Decl. Ex. A at 7.)  Thus, Plaintiffs' general and conclusory allegation about JPMorgan's unusual deliveries is not factually sufficient to plead that Defendants acted with the purpose or conscious object of causing or affecting a price or price trend in the market.  Cf. Harris, 572 F.3d at 72 ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that 'tenet' is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

For these reasons, Plaintiffs fail to meet Rule 8(a)'s requirement that a statement of facts do something more than "merely create[] a suspicion of a legally cognizable right of action." See Twombly, 550 U.S. at 555.  The Complaint here does not include factual allegations sufficient to support the reasonable inference that Defendants acted with the purpose or conscious object of causing artificial to exist silver futures prices or an artificial price trend on the COMEX market.

*(c)  The Existence of Artificial Prices*

Artificial prices are those prices that do not reflect the forces of supply and demand in the market or do not otherwise comport with contemporaneous prices in comparable markets.  See In re Sumitomo Copper Litig., 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998); In re Cox, 1987 WL 106879, at *8-9.  When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue.  See Sumitomo Copper Litig., 182 F.R.D. at 90 n.6; (see also Pls. Mem. at 16 n.16).

Here, Plaintiffs claim "artificiality" on the basis that, on June 26, 2007, on August 14-15, 2008, and, between March 17, 2008 and March 25, 2010, COMEX silver futures prices "outperformed" or were "substantially" different from "the benchmark of gold prices that was used and approved by the CFTC" in its 2008 Report.  (Pls. Mem. at 16 (citing Compl. ¶¶ 9, 14-15, 87).)  But Plaintiffs raise these allegations without first explaining why COMEX silver futures prices should be compared solely to "the benchmark of gold prices."  Indeed, both the 2008 and 2004 CFTC Reports state that the CFTC "routinely" compares the price at which silver futures are traded on COMEX (as a division of NYMEX) with the prices at which silver futures are traded in the London Bullion Market (LBMA) and that it is the LBMA which provides "the benchmark value of silver in the marketplace."  (Compare Davidoff Decl. Ex. A at 5 with Davidoff Decl. Ex. B at 7-8.)  Furthermore, in the 2008 CFTC Report concluding that there had been no manipulation of the silver futures market between 2005 and 2007, the CFTC stated that "the basis difference" between NYMEX futures prices and LBMA futures prices for this period "ranged between plus and minus 5%, . . . although on a few occasions the basis was as much as 15%."  (Davidoff Decl. Ex. B at 8.)  During the Class Period at issue here, the average basis

24

difference between NYMEX and LBMA prices was also approximately 5%, (see Decl. of

Amanda Davidoff in Supp. of Defs. Reply Mem. ("Davidoff Reply Decl.") Ex A ("Standardized

LMBA-NYMEX Silver Basis Jan. 3, 2005 through October 27, 2010"), March 26, 2012, ECF

No. 103), and this fact undercuts Plaintiffs' claim about artificial silver prices on COMEX

during this period.[8]

    Moreover, to the extent that the CFTC does compare the prices at which silver futures

contracts trade with the prices at which other metals trade, the CFTC considers not only gold,

but platinum <u>and</u> palladium as well.  (<u>See</u> Davidoff Decl. Ex. A at 4-5; Davidoff Decl. Ex. B. at

7, 12-13.)  In so doing, the 2008 CFTC Report upon which Plaintiffs base their COMEX gold

price "benchmark" comparisons, observed that all four of these metals had similar price

movements between 2005 and 2007.  (<u>See</u> Davidoff Decl. Ex. B at 7.)  The Report then

concluded that there was "nothing obvious in the silver price series between 2005 and 2007,

when compared to other metals' prices, to suggest that silver prices have been manipulated

downward."  (<u>Id.</u>)  During the Class Period at issue here, these four metals have, in general,

continued to exhibit similar price trends and, in particular, silver has continued to outperform

platinum and palladium.  (<u>See</u> Davidoff Reply Decl. Ex. B.)  Accordingly, the Complaint's

allegation that prices for silver—which, unlike gold, is an industrial metal—did not mirror the

exact rate of price fluctuations for gold is not sufficient to support Plaintiffs' claim that

artificially manipulated silver prices existed on COMEX during the Class Period.

_____

[8]A court may take judicial notice on a motion to dismiss of items "that can be accurately and readily determined
from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); <u>see also</u> <u>Ganino v.</u>
<u>Citizens Utils. Co.</u>, 228 F.3d 154, 166 n. 8 (2d Cir.2000) ("[T]he district court may take judicial notice of
well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."); <u>King</u>
<u>Cnty., Wash. v. IKB Deutsche Industriebank AG</u>, 708 F. Supp. 2d 334, 347 (S.D.N.Y. 2010).

Plaintiffs next argue that the existence of artificial prices was sufficiently pled because of the "snap back" in silver futures prices, which they allege occurred following—and because of—the CFTC's March 25, 2010 public hearing about prices in the metal markets.  (See Pls. Mem. at 17 (citing Compl. ¶¶ 3(d), 14, 79, 87, 130-33, 175-78).)  More specifically, Plaintiffs assert, without showing that JPMorgan had a dominant short position which had "a manipulative effect," that "from the time of" the March 2010 CFTC meeting, JPMorgan's dominant short position was reduced by one-third and this caused "a substantial <u>lessening</u> of JPMorgan's manipulative effect."  (Id.) (emphasis added).  Plaintiffs further assert that the "alleviation caused prices of the COMEX silver futures to snap back and go up in relation to the prices of the CFTC approved benchmark of COMEX gold prices."  (Id.)  Plaintiffs fail to address, however, the fact that during this same time period, the prices for silver and palladium moved in tandem with one another.  (See Davidoff Reply Decl. Ex. B.)  Plaintiffs also fail to make any showing as to how the alleged reduction of JPMorgan's dominant short position was tantamount to a "manipulative effect."

Although Plaintiffs rely on the securities fraud case, <u>ATSI Communications v. Shaar Fund, Ltd.</u>, 493 F.3d 87 (2d Cir. 2007), to support their argument, that case is distinguishable. (See Pls. Mem. at 17 n.21 (citing <u>ATSI</u>, 493 F.3d at 103-04).)  Plaintiffs cite <u>ATSI</u> for "the premise . . . that an issuer's stock price, in the absence of manipulation, should increase when good news is announced."  <u>ATSI</u>, 493 F.3d at 103.  Notwithstanding the fact that the <u>ATSI</u> Court went on to critique this theory, stating that "[t]he strength of this broad proposition is questionable,"  <u>id.</u> n.5, the instant case is distinguishable from the situation in <u>ATSI</u>.  Here, Plaintiffs allege that "silver prices went down, while gold prices went up, during the regime of JPMorgan's dominant short position in silver.  But when JPMorgan's percentage concentration

in silver fell by one-third, silver prices then outgained gold prices." (Pls. Mem. at 17 n.21.) As just discussed, however, pegging silver prices to gold prices alone is an insufficient means of showing price artificiality. (See Davidoff Decl. Ex. A at 4-5, Ex. B at 7, 13-16.) Therefore, any difference between the prices of the two commodities is not readily analogous to the premise in ATSI as to how a market should react to "good news" absent manipulation and nowhere in the Complaint is there any allegation of similarly "good news."

Even more critically, Plaintiffs fail to show a correlation between the March 25, 2010 hearing and the rising price of silver futures on COMEX because prices did not actually increase until August 2010, more than five months after the CFTC hearing. (See Davidoff Decl. Ex. D.) Plaintiffs attempt to resuscitate their claim in their opposition memorandum by stating that, while the CFTC hearing was the cause of the "snap back," the impact of the meeting was only felt when, in August 2010, "it was publicly announced in news articles . . . that JP Morgan was exiting its proprietary commodities or metals trading operations." (Pls. Mem. at 17 n.20.) But this explanation still fails to connect the March 2010 CFTC meeting with the August 2010 market price fluctuations and therefore does not help to support Plaintiffs' cause and effect analysis.

Furthermore, the sample news report that Plaintiffs reference makes no mention of the March 2010 CFTC hearing, and instead discusses how JPMorgan "reportedly closed its proprietary trading desk for commodities, as an early reaction to the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act." (Davidoff Reply Decl. Ex. C (FO Week, "JP Morgan Closes Commodities Prop Desk," Aug. 27, 2010) at 2 (emphasis added).) In view of the many months separating the March 2010 CFTC hearing and the alleged August 2010 "snap back" in silver futures prices, as well as the fact that the news report upon which Plaintiffs rely

27

states that JPMorgan was reportedly acting in response to the Dodd-Frank Act and not to the

CFTC hearing, the alleged "snap back" is not sufficient to support Plaintiffs' claim about the

existence of artificial silver prices on COMEX during the Class Period.  Cf. In re DiPlacido

("DiPlacido II"), CFTC No. 01-23, 2008 WL 4831204, at *30-31 (CFTC Nov. 5, 2008) ("[A]

statistically unusual high (or low) price will not on that basis alone be deemed artificial.") aff'd

DiPlacido v. CFTC, 364 F. App'x 657, 661-62 (2d Cir. 2009).

    Plaintiffs' final argument that artificial prices existed during the Class Period relies on

allegations of "multiple, different illegitimate supply factors."  (Pls. Mem. at 17-18.)  According

to Plaintiffs, these factors "include (a) the large short position held by JPMorgan; (b) specified

uneconomic trades explicitly alleged to have been made by JPMorgan at specific times of day on

specific days on the COMEX; and (c) the classic manipulative device of deliveries by the

dominant short, JPMorgan."  (Id.)  These conclusory allegations, however, relate to Plaintiffs'

theories of causation, not to their claims of artificial prices.  Cf. Sumitomo Copper Litig., 182

F.R.D. at 90 n.6 (explaining that artificial prices may be shown through discussion of an

underlying commodity's normal market forces, historical prices, supply and demand factors,

price spreads, and also the cash market for the commodity at issue).

    More specifically, the first illegitimate supply factor that Plaintiffs cite—"the large short

position held by JPMorgan," (Pls. Mem. at 18)—is not, by itself, sufficient to support a claim of

artificial prices or potentially manipulative pressure because JPMorgan's short position on

COMEX was known and permitted by the CFTC, (see Compl. ¶¶ 71-87, 129-30).  Although

Plaintiffs rely on In re DiPlacido ("DiPlacido I"), CFTC No. 01-23, 2004 WL 2036910, at *3-7

(CFTC Sept. 14, 2004) to support their position, DiPlacido does not stand for the proposition that

a large short position necessarily causes artificial prices, (cf. Pls. Mem. at 18).  Rather, unlike the

situation here, artificial prices were found to exist in <u>DiPlacido</u> because the defendant, who had a

large long position in shell egg futures, created illegitimate supply factors by violating bids and

offers during the closing of options, making non-competitive after-hours trades, and paying more

or less money than was required to finalize trades.  <u>Id.</u> at *8-9; <u>see also</u> <u>DiPlacido II</u>,

2008 WL 4831204, at *10.

      Plaintiffs' second argument about illegitimate supply factors is similarly weak.  (<u>See</u> Pls.

Mem. at 18.)  The allegation that large unspecified and "uneconomic" trades were taking place

on the COMEX during the more than two-and-a-half year Class Period is too general to plead the

existence of artificial prices.  Plaintiffs' final "illegitimate supply factor" allegation—that

Defendants used "the classic manipulative device of deliveries by the dominant short,

JPMorgan," (<u>id.</u>)—also does not show that JPMorgan created artificial prices.  As discussed

<u>supra</u>, the sections in the Complaint upon which Plaintiffs rely (<u>see</u> Pls. Mem. at 18 (citing

Compl. ¶¶ 2-12, 68-87, 96-120, 121-28, 130, 138-74)), to support their claim of an illegal supply

factor on the basis of "unusual deliveries" fail to identify the timing or volume of any delivery

by JPMorgan during the Class Period, and without these additional factual allegations, Plaintiffs'

illegal supply factor claim is insufficiently pled, (<u>see</u> Op. & Order, Section V.A.3(b)).[9]

      For these reasons, Plaintiffs have failed to plead factual allegations sufficient to show

that artificial prices existed in the COMEX silver futures market during the Class Period.

Moreover, even if Plaintiffs had provided sufficient factual allegations in support of their

---

[9]To this point, the CFTC observed in its 2004 Report that, "[e]ven if the commercial short positions were not hedge positions, and even if their selling did cause the silver price to decline, any artificially low prices could not persist for long.  Because there is unrestricted access to the market, many knowledgeable and well-capitalized traders would readily buy any silver offered at artificially low prices.  The buying by these traders–buying that the alleged manipulators would have no way of preventing–would quickly cause the price to rise to its appropriate level." (Davidoff Decl. Ex. A at 5.)

artificial prices claim, Plaintiffs are still not be able to overcome their failure to plead causation, the fourth and final element in a market manipulation claim.

### (d)  Causation of Artificial Prices

The causation element requires that a defendant be the proximate cause of the price artificiality.  See In re Cox, 1987 WL 106879, at *12; see also DiPlacido v. CFTC, 364 F. App'x at 661-62.  Here, Plaintiffs argue two theories of causation: causation by JPMorgan's large short position and causation by JPMorgan's large uneconomic trades.  (Pls. Mem. at 18-21.) Defendants contend that these theories amount to "nothing more than generalized allegations of market conditions and trading patterns that are not linked to JPMorgan."  (Defs. Mem. at 14.) Defendants also point out that one of Plaintiffs' arguments is directly rebutted by the CFTC's 2004 and 2008 investigation reports, which found that "long-term downward manipulation of the silver market was 'not realistic' or 'plausible.'"  (Defs. Reply Mem. at 10 (citing Davidoff Decl. Exs. A & B).)

Under their first theory, Plaintiffs point to allegations in the Complaint of the approximate size of JPMorgan's short position at certain dates and the percentage that the position constituted in the silver futures market.  (See Pls. Mem. at 19-20 (citing Compl. ¶¶ 3-7, 51, 55-87, 110-20, 131, 133).)  Plaintiffs then ask this Court to infer that "[b]ecause JPMorgan held such a large dominant short position, it is difficult to imagine anyone else, working alone, who had the ability to cause such large declines in prices which, clearly, benefitted JPMorgan at least three times more than it benefitted any other trader."  (May 21, 2012 Letter from Pls. to the Court at 3 (emphasis added).)  However, the "imagination" required to link these conditions, without corroborating factual allegations as to trades, sworn affidavits, or other evidence is tantamount to impermissible speculation on the basis of sheer possibility.  Cf. Iqbal, 556 U.S. at

678 (While "[t]he plausibility standard is not akin to a probability requirement, . . . it asks for more than a sheer possibility that a defendant acted unlawfully.").

Plaintiffs' second theory that JPMorgan caused artificial prices by making large uneconomic trades on June 26, 2007, August 14-15, 2008, and at other times during the Class Period is no more successful. First, without more specific factual allegations as to the amounts and to the timing of certain trades, Plaintiffs' claim that JPMorgan submitted an unknown number of "sell orders" when silver prices were high and an unknown number of "purchase orders" when prices fell, (see, e.g., Compl. ¶¶ 55, 58), indicates no more than normal, rational market participation by JPMorgan. Indeed, the CFTC's 2005-2007 investigation considered the trades made on June 26, 2007 and determined that the market was free of manipulation at that time. (See Davidoff Decl., Ex. B at 1.) Secondly, the portions of the Complaint that discuss the August 14-15, 2008 silver price fluctuations rest on the conclusion that JPMorgan "must have" caused the fluctuations and high trading volume because no other "information coming to the silver market" explained the price behavior at that time. (Compl. ¶ 115.) The Complaint's descriptions of other uneconomic trades allegedly made during the Class Period similarly fail to allege specific conduct that might be reasonably attributed to JPMorgan.[10] (See Pls. Mem. at 21 (citing Compl. ¶¶ 2-7, 55-87, 95-127, 138-76).)

Moreover, the statements made by the unidentified "market professional," (Compl. ¶¶ 121-23), by the unnamed "whistleblower," (id. ¶¶ 125-26), and by the "bragging" JPMorgan traders, (id. ¶ 176), are not sufficiently factual to show that JPMorgan was the proximate cause

---

[10]At oral argument, Plaintiffs conceded this weakness when they stated, "[n]ow, in this case we allege 20-some odd examples, including J.P. Morgan, . . . but mostly not tied to J.P. Morgan, of situations where the day is really almost no trading going on and a big order comes in all at once and wants to come in all at once and moves the price down. (Tr. of May 16, 2012 Hr'g ("5/16/12 Tr.") at 80-81 (emphasis added).)

of the price fluctuations during the Class Period. The unidentified market professional, for example, is alleged to have brought a series of trades to the attention of the CFTC, but the market professional is not alleged to have named JPMorgan as a party to these trades. (See id. ¶ 122.) Indeed every one of the market professional's statements are made in the passive voice alleging that, "there was heavy selling of silver and gold;""[t]here were large sellers who came into both the gold and silver markets to drive the prices down;" and so on. (Id.)

By comparison, the unnamed whistleblower who contacted the CFTC in November 2009 does specifically name JPMorgan, but only to assert conclusory and speculative allegations that JPMorgan and its co-conspirators "manipulate[d] and suppress[ed] the price of COMEX silver futures and options contracts." (Id. ¶ 123; see also id. ¶¶ 124-127.) The Complaint alleges no other information about this whistleblower or about the details of the manipulation that the whistleblower is purported to have observed. Indeed, the whistleblower's statement is itself speculative as to JPMorgan's role in the causation: "[h]ow would th[e price fluctuations] be possible if the silver market was not in the control of [JPMorgan and its co-conspirators] . . . . ?" (Id. ¶ 127 (alterations made in Complaint).)

For the reasons discussed supra, the statements by the "bragging" JPMorgan traders are also insufficient to support the allegation that JPMorgan caused artificial prices in the COMEX silver futures market. (See Op. & Order Section V.A.3(b).) The Complaint alleges no information about the date or the language of the remarks deemed to be "bragging;" the identity of the traders who made these remarks; which of the many trades that took place over the two-and-a-half year Class Period were the subject of the traders' bragging; and no information about whether the traders were acting at the instigation of JPMorgan to move silver prices on the market. Cf. Harris, 572 F.3d at 72 (stating that "legal conclusions, and threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements" are not entitled to presumption of truth).

Finally, Plaintiffs' allegations are insufficient to support the claim that JPMorgan caused the Saxo Bank pricing platform to be manipulated. (See Compl. ¶¶ 157-74.) The Complaint fails to allege facts showing how JPMorgan traders accessed the proprietary Saxo Bank pricing platform or how JPMorgan might have issued the alleged spoof orders and fake signals on the platform. In addition, Plaintiffs' descriptions of the alleged signal activity is purported to provide "details [of] the time, date, and price point of the false trade; the time, date, and volume of the dramatic decline in price on COMEX silver; and other details," but the Complaint fails to identify the parties involved in the illegal trading episodes on the pricing platform. (Id. ¶ 166.) The Complaint's allegations also fail to demonstrate a cognizable relationship between the purported signals on the Saxo Bank pricing platform and the purported response in the COMEX market. (See id. ¶¶ 167-74.) Indeed, the fluctuations in the market prices, the bounce-backs, and the times at which the alleged trades occurred, differ widely among the examples that Plaintiffs cite. (Id.) Accordingly, neither of Plaintiffs' theories is sufficient to show plausibly that any actions by Defendants were the proximate cause of artificial prices on the COMEX during the Class Period as required under Rule 8(a). Cf. In re Cox, 1987 WL 106879, at *12 ("If the multiple causes [of an artificial price] cannot be supported out, or if the respondents are not one of the proximate causes, then the charge of manipulation cannot be sustained.").

Thus, for the reasons just stated, the Complaint fails—under the standard set forth by Rule 8(a)— to plead factual allegations sufficient to allow the Court to draw "the reasonable inference" that Defendants are liable for the misconduct alleged. See Iqbal, 556 U.S. at 678. Rather, the Complaint merely pleads facts that might be "consistent with" Defendants' liability

and it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Id.
(citing Twombly, 550 U.S. at 557).  In light of the foregoing conclusion that Plaintiffs failed to
meet the pleading standard of Rule 8(a), the Complaint therefore also fails to meet the
heightened pleading standard set forth by Rule 9(b).

> **B.**    **Commodity Exchange Act Aiding and Abetting Liability Claims**
>
> 1.  Elements of Aiding and Abetting Liability

Section 22 of the Commodity Exchange Act creates liability for any person "who
willfully aids, abets, counsels, induces, or procures the commission of a violation" of the act.
7 U.S.C. § 25(a)(1).  In order to state a claim under this section, a plaintiff must show that a
"defendant (1) had knowledge of the principal's intent to violate the Commodity Exchange Act;
(2) intended to further that violation; and (3) committed some act in furtherance of the
principal's objective."  Platinum & Palladium, 828 F. Supp. 2d at 599;  see also Natural Gas
Commodity Litig., 337 F. Supp. 2d at 511.

> 2.  Analysis of Alleged Aiding and Abetting Liability

As a matter of law, where a complaint fails to allege the requisite intent of any primary
actor to manipulate a market, that complaint also fails to state a claim for aiding and abetting
liability in violation of Section 22 of the Commodity Exchange Act.  See Platinum & Palladium,
828 F. Supp. 2d at 599.  Here, Plaintiffs have failed to state a claim for market manipulation by a
principal, (see supra, Section V(A)), and thus have also failed to state that Defendants are liable
for knowingly aiding and abetting a market manipulation.  Plaintiffs' claims also fail to state a
claim for aiding and abetting liability because the Complaint does not identify the persons
alleged to have been involved in knowingly aiding and abetting the alleged manipulation of
silver futures prices on the COMEX market.  Indeed the Complaint includes no reference to

specific communications between the Defendants or acts about plans to manipulate the market. Plaintiffs' aiding and liability claim is therefore dismissed.

> **C.    Claims under the Sherman Antitrust Claim**

>    1.    Elements of Sherman Antitrust Violation

Under Section 1 of the Sherman Antitrust Act, "[e]very contract, combination[,] . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  15 U.S.C. § 1.  To state a claim under Section 1, a plaintiff must provide plausible grounds to show that the "challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  Twombly, 550 U.S. at 553 (internal quotation marks omitted); see also In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (dismissing conspiracy claims because plaintiffs were "unable to allege facts that would provide plausible grounds to infer an agreement") (internal quotation marks omitted).  "While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense."  Twombly, 550 U.S. at 553 (internal quotation marks and alterations omitted).

>    2.    Analysis of Alleged Sherman Antitrust Violation

Defendants argue that Plaintiffs' Sherman Antitrust claim should be dismissed because the Complaint rests almost entirely on the recitation of Section 1's legal elements and because such "'threadbare recitals of the elements of a cause of action' are not entitled to be taken as true."  (Defs. Mem. at 24 (citing Harris, 572 F.3d at 72).)  Defendants also argue that the Sherman Antitrust claim should be dismissed because the Complaint fails to plead sufficient factual allegations about either the identity of any alleged co-conspirator or the existence of any agreement—tacit or otherwise.  (Defs. Mem. at 23-25; Defs. Reply Mem. at 16-17.)  Plaintiffs

respond that "the Complaint contains specific allegations of concerted action by JPMorgan and

an identified floor broker [Marcus Elias] and unidentified other floor brokers, in furtherance of

their participation in a contract, combination or conspiracy to manipulate and suppress the prices

of silver futures and options contracts traded on the COMEX."  (Pls. Mem. at 32-33 (citing

Compl. ¶¶ 5, 27, 56-57, 110-128).)

        The paragraphs, 5, 27, 56-57, and 110-128, which Plaintiffs cite in support of their

conspiracy claim are conclusory statements, however, and, without more, show only that

JPMorgan was engaged in some level of ordinary market activity.  Cf. Williams v. Citigroup,

Inc., 2009 WL 3682536, at *6 (S.D.N.Y. Nov. 2, 2009) (dismissing Section 1 claim where

complaint did not state factual allegations as required by Iqbal and Twombly identifying co-

conspirators or showing that an agreement was made), aff'd in part and vacated in part on other

grounds, 433 F. App'x 36 (2d Cir. 2011).  For example, referenced Paragraph 27 states that,

> John Doe Defendants 1-10 are persons, whose identities are
> presently unknown to Plaintiffs, who performed, participated in,
> furthered, and/or combined, conspired, or agreed with JPMorgan
> to perform the unlawful act[s] alleged herein, including acting as
> JPMorgan's broker in the restraint of trade, fixing of prices, and
> manipulation of silver futures and silver options traded on the
> COMEX.

(Compl. ¶ 27.)  This Paragraph does not contain sufficient factual allegations to support the

existence of a conspiracy by JPMorgan to restrain trade or to manipulate the silver futures

markets.  Nor do cited Paragraphs 110 through 120.  Contrary to Plaintiffs' assertion that these

particular paragraphs "detail[] JPMorgan and its co-conspirators' manipulation of COMEX

silver futures contracts on August 14, 2008," (Pls. Mem. at 33), these paragraphs describe silver

futures market price fluctuations and then cite the statement of an unidentified witness to link the

price movement to JPMorgan alone, (see id. ¶ 112) ("[T]he price movement occurred because

JPMorgan used its massive selling power and spoof orders to move the market lower . . . .")
(emphasis added).  But there is no allegation explaining how JPMorgan "used" its selling power
to move the market.  Referenced Paragraphs 121 and 122 similarly fail to identify any party that
might have been involved in a conspiracy to bring about the "high-volume, uneconomic and
irrational trading that caused artificial COMEX futures silver prices."  (See Pls. Mem. at 33
(summarizing allegations from Complaint).)  In this regard, the Complaint also fails to explain
the basis for its allegations that the subsidiary companies within the JPMorgan Group
Defendants were engaged in such a conspiracy.  (See Compl. ¶¶ 22-25.)

Although Paragraphs 57 and 58 do discuss how Marcus Elias, a former wrestling
teammate of JPMorgan senior silver trader Chris Jordan, acknowledged executing purchase
trades for JPMorgan on June 26, 2007, these paragraphs do not allege any type of conspiracy
between the two men and neither is named as a defendant or conspirator in this action.
Likewise, the paragraphs in the Complaint insinuating the existence of a specific relationship
between JPMorgan and HSBC, (see id. ¶¶ 88, 90, 94, 138-63, 181), do not allege any facts
showing that JPMorgan conspired with HSBC to violate the Sherman Antitrust Act, and HSBC
is not named as a defendant in this case, (id. ¶¶ 26).

The Complaint also lacks sufficient factual allegations to support Plaintiffs' claim that
the Saxo Bank trading platform served as a vehicle for Defendants' alleged conspiracy.  Indeed
the Complaint provides only the conclusory allegations that JPMorgan and unidentified co-
conspirators used Saxo Bank as a vehicle for making "signals" that were used to drive down the
price of silver futures contracts.  (See id. ¶¶ 150, 154, 153, 161.)  However, the Complaint  fails
to include any factual allegations as to the identity of these alleged co-conspirators, the existence
of the agreement between them, or the relationship that JPMorgan had to the purported

"signals." For these reasons, the Complaint fails to state sufficient factual allegations as required by <u>Twombly</u> to show the existence of an actual conspiracy to manipulate the price of COMEX silver futures and options. <u>Cf.</u> <u>Twombly</u>, 550 U.S. at 556-57. Plaintiffs' claim that Defendants violated Section 1 of the Sherman Antitrust Act is therefore dismissed.

## VI.    MOTION TO COMPEL LIMITED DISCOVERY

Plaintiffs' motion to compel requests (1) discovery of all documents produced by JPMorgan to the CFTC during the CFTC's investigation of silver futures contracts and (2) an order that the parties confer pursuant to Rule 26(f) so that Plaintiffs can request "the basic documents reflecting [JP]Morgan's COMEX silver futures transactions and related conduct to any extent such documents were not contained in Morgan's production to the CFTC." (Pls. Compel. Mem. at 1.) To support their discovery request, Plaintiffs rely on an unpublished order from <u>In re Platinum & Palladium Commodities Litigation</u>, denying a defendant's motion to stay the discovery of documents already produced by the defendant to the CFTC. (<u>See</u> Pls. Compel Mem. at 6-7 (discussing <u>Platinum & Palladium Commodities Litig.</u>, No. 10 CIV 3617, ECF No. 59 (S.D.N.Y. Nov. 30, 2010)).) This authority is not persuasive, however, because the situation in <u>Platinum & Palladium Commodities Litigation</u> is easily distinguished from the present matter.

In <u>Platinum & Palladium Commodities Litigation</u>, the plaintiffs initiated an action against the defendants <u>after</u> the CFTC had issued an order finding that the defendants had traded palladium and platinum futures contracts "with the intent to move higher the settlement prices." <u>Platinum & Palladium Commodities Litig.</u>, No. 10 CIV. 3617, ECF No. 59 at 2. The plaintiffs in that case also attached the CFTC's order to their complaint against defendants. In light of this CFTC order, the <u>Platinum & Palladium Commodities Litigation</u> Court concluded that limited discovery of the documents produced to the CFTC was "reasonable under the circumstances

while the motion to dismiss [wa]s pending."  Id.  Here, by contrast, the Complaint does not

include any attached CFTC order stating that Defendants traded in silver futures contracts with

an intent to manipulate settlement or market prices.[11]  Moreover, the CFTC has twice initiated

investigations into the alleged manipulation of the COMEX silver futures market and twice

found that no such manipulation occurred.  (See Davidoff Decl., Exs. A & B.)  The CFTC's third

and still ongoing investigation has spanned  more than three years, and has also yet to result in

any charges being filed.  Because it is not clear that Plaintiffs' Complaint is viable or that the

CFTC's lengthy investigation into Defendants' conduct will result in any criminal action being

filed, Plaintiffs' motion to compel limited discovery is DENIED.

## VII.   LEAVE TO REPLEAD

Rule 15(a) of the Federal Rules of Civil Procedure provides that courts "should freely

give leave" to amend a complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Here,

however, Plaintiffs have represented that they "alleged all [they] realistically could," in their

lengthy 90-page, 210-paragraph consolidated class action Complaint filed on behalf of the forty-

four individual plaintiffs.  (See May 17, 2012 Letter from Pls. to the Court at 4.)  In light of

Plaintiffs' representation and the fact that the class action Complaint still fails to plead factual

allegations sufficient to support Plaintiffs' claims, and because the Court is unaware that

---

[11]In response to Plaintiffs' request for the production of documents at a status conference on February 25, 2011, the
Court similarly observed:

I'm sure the discovery that was done for the commodities futures exchange was a pretty massive
discovery, knowing what the government would request generally under the circumstances.  And it's
been three years since they started that discovery.  And there's been no complaint.  So I'm a little
reluctant to order the discovery, unless I see the ground that Judge Pauley acted on [in Platinum &
Palladium Commodities Litigation].  Normally, in these cases, you don't get discovery until after an
issue is joined . . . . So I want to see the grounds upon which he acted.  Maybe if you have a criminal
charge, and you have an antitrust case arising out of the same facts and circumstances, that's one
thing.  But if you don't have the charge, it's another.

(2/25/11 Tr. at 52-53.)

anything has developed since oral argument, it is not clear that justice so requires leave to amend

the Complaint at issue.  See Williams v. Citigroup, 659 F.3d 208, 212 (2d Cir. 2011)

(recognizing wide discretion afforded to district courts to dismiss complaint without granting

leave to replead).  Plaintiffs will be given thirty days from the filing of this opinion to show good

cause why leave to file an amended complaint is necessary.

## VIII.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (ECF No. 91) is

GRANTED.  Plaintiffs will be given thirty days to show why leave to replead is necessary.

Plaintiffs' motion to compel limited discovery (ECF No. 104) is DENIED.

IT IS SO ORDERED.

Dated:  New York , New York
        December 21, 2012

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Opinion & Order were sent via fax or email to:**

Plaintiffs' Interim Lead Class Counsel

Christopher Lovell
Lovell Steward Halebian Jacobson LLP
61 Broadway, Suite 501
New York, NY 10006
Ph: (212) 608-1900
Fax: (212) 719-4677

Counsel for Defendants JPMorgan Chase & Co.; JPMorgan Clearing Corp.; JPMorgan
Securities, Inc.; JPMorgan Futures, Inc.

Amanda Flug Davidoff
Sullivan & Cromwell LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
Ph: (212) 956-7500
Fax: (212) 293-6330
Email: davidoffa@sullcrom.com

Daryl A. Libow
Sullivan & Cromwell LLP
1701 Pennsylvania Ave., N.W.
Washington D.C. 20006
Ph: (202) 956-7500
Fax: (202) 293-7495
Email: libowd@sullcrom.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

IN RE COMMODITY EXCHANGE, INC.                    11 Md. 02213 (RPP)
SILVER FUTURES AND
OPTIONS TRADING LITIGATION                        **OPINION AND ORDER**

------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

I.    **BACKGROUND**[1]

  Plaintiffs in this action are a proposed class of individuals who transacted in COMEX

silver futures and options contracts on June 26, 2007 and also between March 17, 2008 and

October 27, 2010 (the "Class Period").  On September 12, 2011, Plaintiffs filed a consolidated

class action complaint (the "First Complaint") against J.P. Morgan Chase & Co., J.P. Morgan

Clearing Corp., J.P. Morgan Securities Inc., and J.P. Morgan Futures Inc. (together,

"JPMorgan"), as well as twenty unnamed "John Doe" Defendants (collectively, "Defendants").

(Compl. ¶¶ 1-2, 22-29, 199-210, ECF No. 85.)  Plaintiffs' First Complaint alleged that

Defendants had violated Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§

13(a), 25(a), and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  (Id.)

  On December 21, 2012, this Court issued an Opinion and Order (the "Opinion")

dismissing Plaintiffs' First Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  (Op. at 40, Dec. 21, 2012, ECF No. 127.)  In so doing, the

Court ruled that Plaintiffs had failed under the pleading standard set forth by Rule 8(a) to allege

adequately scienter, the existence of artificial prices, or causation as required by the Commodity

Exchange Act.  (Op. at 23-34.)  The Court further ruled that Plaintiffs had failed to state factual

---

[1]Because the factual and procedural history of this case was discussed at length in the Court's Opinion dated
December 21, 2012, (see Op. at 1-15), the Court recounts the history of this case only as is necessary to dispose of
the pending Motion for Leave to File an Amended Consolidated Class Action Complaint.

allegations adequate to allege the existence of a conspiracy to manipulate market prices as required by the Sherman Antitrust Act.  (Op. at 35-38.)  Finally, because Plaintiffs had stated at oral argument and in a letter to the Court that they had "alleged all [they] realistically could," (see Op. at 39), the Court gave Plaintiffs thirty days from the date of the Opinion's publication to show "good cause" as to why leave to amend was necessary, (Op. at 40).

## II.    MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

On January 22, 2013, Plaintiffs filed a Motion for Leave to File an Amended Consolidated Class Action Complaint (the "Motion").  (Pls.' Mot. for Leave to File Am. Consol. Compl., ECF No. 129; see also Pls.' Mot. for Leave to File Corrected Am. Consol. Compl., ECF No. 131; Mem. in Supp. of Pls. Mot. for Leave to File Corrected Am. Consol. Compl. ("Pls. Mem."), ECF No. 132.)  Attached to this Motion was a proposed amended consolidated class action complaint (the "Proposed Amended Complaint").  Plaintiffs argued that they should be permitted to file this Proposed Amended Complaint because (1) "the law favors permitting leave to amend;" (2) they had added specific, "multiple additional details and facts" that addressed the gaps identified by the Court in its Opinion; and (3) they believed grounds existed to add a new claim alleging a Sherman Act Section 2 monopolization claim against the Defendants.  (Pls. Mem. at 1.)

On February 8, 2013, Defendants filed a memorandum in opposition arguing that Plaintiffs' Motion should be denied because the Proposed Amended Complaint still failed to adequately allege a violation of the Commodity Exchange Act or Sherman Antitrust Act.  (Defs.' Mem. in Opp'n to Mot. for Leave to File Am. Consol. Compl. ("Opp'n Mem."), ECF No. 139; see also Decl. of Amanda F. Davidoff in Supp. of Defs.' Opp'n Mem. ("Davidoff Decl."), Feb. 8, 2013, ECF No. 140.)  Defendants further argued that the Proposed Amended Complaint was futile and "dilatory," and that granting Plaintiffs' Motion would "both cause JPMorgan undue

2

prejudice and waste judicial resources." (Opp'n Mem. at 7.) Plaintiffs filed a memorandum in

reply on February 19, 2013. (Reply Mem. in Supp. of Pls.' Mot. for Leave to File Am. Consol.

Compl. ("Reply Mem."), ECF No. 144.)

## III.    APPLICABLE LEGAL STANDARD

"The grant or denial of an opportunity to amend [a complaint] is within the discretion of

the district court." Foman v. Davis, 371 U.S. 178, 182 (1962). Pursuant to Rule 15 of the

Federal Rules of Civil Procedure, however, a court must "freely grant leave [to amend] when

justice so requires." Fed. R. Civ. P. 15(a)(2). Justice does not require granting leave to amend

when a proposed amendment would be futile, made in bad faith, result in undue delay, or cause

prejudice to the opposing party. Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009); see also

Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend

should generally be denied in instances of futility, undue delay, bad faith or dilatory motive,

repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to

the non-moving party."). Finally, when a "moving party has had an opportunity to assert [an]

amendment earlier, but has waited until after judgment before requesting leave" to add a new

claim, a court may "exercise its discretion [in considering leave to amend] more exactingly."

State Trading Corp. of India v. Assuranceforeningen Skuld, 921 F.2d 409, 418 (2d Cir. 1990).

## IV.    ANALYSIS

**A. Plaintiffs have failed to show good cause as to why they should be granted leave
to file the Proposed Amended Complaint since the proposed allegations are
insufficient to establish a claim under the Commodity Exchange Act.**

1.    JPMorgan's Alleged Concentrated Large Short Positions

Plaintiffs first argue that they should be granted leave to file their Proposed Amended

Complaint because it contains facts sufficient to show that JPMorgan "uneconomically and

intentionally caused COMEX prices to be artificially low." (Pls. Mem. 2-4.) Specifically,

3

Plaintiffs state that they have added "new allegations relating to JPMorgan's concentrated short position and its effect on COMEX silver futures prices, as well as the fact that COMEX prices accomplished 92%-100% of the price discovery and led London silver prices and [the] world's silver prices throughout the Class Period." (Pls. Mem. at 2-3 (citing Am. Compl. ¶ 137(a)-(z)).) To support this claim, Plaintiffs plead numerous statistics that speak to "the existence of a large concentration" of short positions in the COMEX silver futures market. (Am. Compl. ¶ 137(i).) Plaintiffs claim that these statistics, along with information contained in the 2008 Commodity Futures Trading Commission (CFTC) Report titled "Large Short Trader Activity in the Silver Futures Market," show that JPMorgan "intentionally maintain[ed] a high short concentration in COMEX silver futures" in order to depress COMEX silver prices. (Pls. Mem. at 3 (citing Am. Compl. ¶ 137(i)-(r)); see also Am. Compl. ¶ 137(t)-(u).)

Critically, none of these new allegations, (see Pls. Mem. at 2-4), cure the deficiencies that the Court's Opinion identified in Plaintiffs' First Complaint, (see Op. at 20). Rather these statistics speak to whether it is plausible that JPMorgan had the ability to influence prices in the COMEX silver futures market—a factual allegation which JPMorgan has not disputed. (See Op. at 19.) As this Court noted in its Opinion, "[m]ere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the Commodity Exchange Act." (Op. at 20 (quoting In re Rough Rice Commodity Litig., 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012)).) Here, none of Plaintiffs' new allegations set forth facts showing plausibly that JPMorgan specifically took, or failed to take, an action intended to cause artificial prices to exist in the COMEX silver futures market. Cf. CFTC v. Parnon Energy, Inc., 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012) ("To meet the specific intent element of a claim for manipulation . . . of a futures contract, [a plaintiff] must plead that Defendants acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the

market that did not reflect the legitimate forces of supply and demand.") (internal quotation
marks omitted).

> 2.    The "Small" COMEX Silver Futures Market

Plaintiffs next argue that they should be granted leave to file their Proposed Amended
Complaint because it contains facts sufficient to show that JPMorgan "well knew" the impact
that its "large concentrated positions had on COMEX silver futures prices" and that JPMorgan
therefore "intentionally concentrated its large short position in the small COMEX silver futures
market, rather than in the large London Market, precisely to cause such depressant and
suppressant effect on COMEX silver futures contract prices."  (Pls. Mem. at 5 (citing Am.
Compl. ¶ 137(a)-(b), (d)-(g), (u), (w)) (emphasis added); see also id. at 2-6.)  But, as just
discussed, alleging that Defendants merely had knowledge that certain actions might have an
impact on the COMEX silver futures market is insufficient to show that Defendants acted with
the intent to cause, or did in fact cause, artificial prices to exist in the marketplace.  (See supra
IV.A.1); see also In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 539
(S.D.N.Y. 2008) ("[E]ntering into a legitimate transaction knowing that it will distort the market
is not manipulation."); cf. Parnon Energy, 875 F. Supp. 2d at 249-50 (inferring intent to
manipulate where complaint alleged that defendants had "awareness of the tight [crude oil]
market" and engaged in contemporaneous communications discussing plans to execute a market
manipulation strategy).

Moreover, Plaintiffs fail to plead any facts sufficient to show why JPMorgan, even if it
did know about the alleged impact of its allegedly held large short positions, should have traded
silver futures contracts somewhere other than on the COMEX silver futures market.  (Cf. Am.
Compl. ¶ 137(a)-(f), (u)-(x).)  Indeed, the claim by Plaintiffs that JPMorgan should have traded
silver futures contracts on the ambiguously described "London Market," (id.), is spurious at best.

5

This is because the London Bullion Market—the "London Market" to which Plaintiffs seem to be referring—facilitates the trading of <u>physical</u> silver bullion and is "[u]nlike a futures exchange," (Davidoff Decl. Ex. D ("Website of the London Bullion Market Association").)[2]  It is therefore of no moment that JPMorgan could allegedly "have made larger transactions with minimal price impact" by selling silver on the London (Bullion) Market, (Am. Compl. ¶ 137(x)), or that a "hedger" might typically seek to "transact in the London (Bullion) Market for large transaction[s] rather than in the COMEX market" so as "to avoid the transaction cost of selling at a lower price."  (Pls. Mem. at 3 (citing Am. Compl. ¶ 137(w)).)  Thus, contrary to Plaintiffs' argument, (Pls. Mem. at 5), the new allegations about trading in the London [(Bullion)] Market, taken together with other allegations in the Proposed Amended Complaint, still fail to allege specific conduct affecting silver futures and options contracts that might be plausibly attributed to JPMorgan's intent to make uneconomic trades or to manipulate silver futures prices in the COMEX market.  <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007) (dismissing claim where plaintiffs failed to "nudge[] their claims across the line from conceivable to plausible").

> 3.  <u>Federal Reserve Report</u>

Plaintiffs also argue that their new allegation about how "JPMorgan has been criticized by the Federal Reserve for saying that it was hedging when it was not hedging," (Am. Compl. ¶ 137(u)), "plausibly" shows that JPMorgan "intentionally suppressed prices" on the silver futures market.  (Pls. Mem. at 6.)  Plaintiffs fail, however, to plead facts sufficient to connect the referenced Federal Reserve Report, entitled "Report of JPMorgan Chase & Co. Management Task Force Regarding 2012 CIO Losses," to this action.  <u>Cf.</u> <u>Rpt. of JPMorgan Chase & Co.</u>

---

[2]While another market in London—the "London Metal Exchange"—does trade in futures and options contracts, it does not deal in <u>silver</u> futures or options contracts.  (See Davidoff Decl. Ex. E ("Website of the London Metal Exchange").)

Mgmt. Task Force re 2012 CIO Losses (Jan. 16, 2013).[3]  First, the report has nothing to do with

trading on the silver futures market.  Instead, it addresses "the review of the JP Morgan Chase &

Co. Management Task Force regarding the losses incurred in 2012 by the Firm's Chief

Investment Office," (id. at 1), an entity that is not implicated in the present action.  Second, the

report involves events that took place in 2012, at least two years after the Class Period ended.

(Id.)  Accordingly, Plaintiffs' Proposed Amended Complaint is similar to Plaintiffs' First

Complaint in that both fail to "include factual allegations sufficient to support the reasonable

inference that Defendants acted with the purpose or conscious object of causing artificial silver

futures prices to exist or an artificial price trend on the COMEX market."  (Op. at 23.)

4.   Price Movements on June 26, 2007 and August 14-15, 2008

Plaintiffs next argue that they have addressed the pleading deficiencies that the Court

identified by including in the Proposed Amended Complaint allegations that "price movement[s]

on June 26, 2007 and August 14-15, 2008 were contrary to and inconsistent with the

fundamentals, the news flow, usual market activity, and a competitive market based on

legitimate supply and demand factors."  (Pls. Mem. at 6 (citing Am. Compl. ¶¶ 4(d), 60, 64, 66,

111, 114, 115).)  These new allegations rely on regression analyses and other statistical work

comparing the market price for COMEX silver to the price for COMEX gold on single days, and

Plaintiffs contend that these statistics show that JPMorgan caused artificial prices to exist in the

COMEX silver futures market on the dates in question.[4]  (Am. Compl. ¶¶ 60, 87, 111; see also

Reply Mem. at 5-8.)

---

[3]The report is available at http://files.shareholder.com/downloads/ONE/2272971153x0x628656/4cb574a0-0bf5-4728-9582-625e4519b5ab/Task_Force_Report.pdf.

[4]To a lesser extent, the Proposed Amended Complaint also discusses comparisons between the daily market price of silver and the daily market prices of platinum and palladium.  (Am. Compl. ¶¶ 60(a)-(h), 87(f)-(j), 111(f)-(g); but see Pls. Mem. at 7 (disparaging utility of price comparisons between these three metals); Reply Mem. at 5-8 (same).)  In so doing, Plaintiffs claim that the alleged fluctuations between silver, platinum, and palladium on specific days also show price artificiality.  (Pls. Mem. at 7.)  But given how susceptible prices on a daily basis (vs.

Plaintiffs' allegations fail, however, to demonstrate plausibly that JPMorgan was the proximate cause of the fluctuations between COMEX silver prices and COMEX gold prices on these specific days. Plaintiffs' statistical analyses reflect generalized fluctuations in the metals markets and Plaintiffs do not include allegations that are sufficiently factual—and not conclusory—to connect or link these fluctuations to actions undertaken by JPMorgan. (Cf. Am. Compl. ¶¶ 60, 61, 87, 111); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (explaining that a court need not accept as true allegations made in a complaint that are "supported by mere conclusory statements"). Moreover, Plaintiffs cannot show price artificiality by relying on daily or short term price comparisons to gold alone. (See Op. at 24-25.) As this Court discussed at length in its Opinion, such comparisons are unreliable. (Id.)

In addition, as was also discussed in the Opinion, the CFTC looks not to price comparisons between gold and silver when assessing manipulation allegations, but rather to the price of physical silver on the London Bullion Market. (Op. at 24-25 (discussing CFTC market reports from 2004 and 2008).) Indeed the London Bullion Market price is "widely regarded as the benchmark value of silver in the marketplace." (Id.) Plaintiffs, themselves, allege that "spot and silver futures prices" on the London Bullion Market moved by magnitudes similar to those on the COMEX market on the dates in question, which directly undercuts Plaintiffs' claims about artificial prices on COMEX. (Am. Compl. ¶¶ 60(a), 111(a)-(b); see also Op. at 24-25 (discussing average basis difference between COMEX and London Bullion Market prices).)

---

an averaged longer term basis) are to multiple factors having nothing to do with the actions of JPMorgan, (see, e.g., Opp'n Mem. at 13-14), these allegations are insufficient to plausibly show price artificiality. Rather, like Plaintiffs' First Complaint, the Proposed Amended Complaint contains factual allegations that could be "consistent with" price artificiality, but it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" (Op. at 34 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).)

> 5.      Price fluctuations after the March 25, 2010 CFTC Meeting on
>         Manipulation & the August 27, 2010 Announcement of a Potential
>         JPMorgan Trading Desk Closure

Finally, Plaintiffs argue that they should be granted leave to file their Proposed Amended

Complaint because it plausibly alleges that COMEX silver futures prices (1) outperformed gold

prices between March 25, 2010, when the CFTC held its hearing on manipulation of the silver

markets, and three weeks later, on April 15, 2010, (Pls. Mem. at 8 (citing ¶ 87(b)); and (2) also

outperformed COMEX gold prices "after JPMorgan announced that it was closing its London

silver office." (Pls. Mem. at 7-8 (citing Am. Compl. ¶ 87(c)-(d)).) However, for the same

reasons identified by this Court in its Opinion, these allegations are insufficient to show that

JPMorgan took any action which caused price artificiality in the COMEX silver futures market.

(Op. at 26-27.) Furthermore, the statistical charts relied on by Plaintiffs showing market price

trends over the two week period following the March 25, 2010 CFTC conference are

inconclusive and contradictory as to price trends on the COMEX market. (Pls. Mem. at 7 (citing

Am. Compl. ¶¶ 14(a), 87).) Similarly inconclusive and contradictory are Plaintiffs' factual

allegations and charts pertaining to market price trends just after the news that JPMorgan had

"reportedly closed its proprietary trading desk for commodities, as an early reaction to the U.S.

Dodd-Frank Wall Street Reform and Consumer Protection Act," (see Davidoff Decl. Ex. G (FO

Week, "JP Morgan Closes Commodities Prop Desk," Aug. 27, 2010) at 2).

    Thus, as the foregoing discussion sets forth, none of the allegations added by Plaintiffs in

the Proposed Amended Complaint cure the pleading deficiencies that led to the dismissal of

Plaintiffs' First Complaint for failure to state a claim. The Proposed Amended Complaint still

fails to state a claim pleading facts constituting a violation of the Commodity Exchange Act and

thus the Proposed Amended Complaint would not be able to survive a Rule 12(b)(6) motion to

dismiss on these claims. Accordingly, the proposed amendments would be futile and justice

does not require granting Plaintiffs leave to file the Proposed Amended Complaint. See Foman,

371 U.S. at 182 (A motion to amend should be denied if there is an "apparent or declared

reason—such as . . . futility of amendment."); Kaster v. Modification Sys., Inc., 731 F.2d 1014,

1018 (2d Cir. 1984) ("That [an] amendment[] would not serve any purpose is a valid ground to

deny a motion for leave to amend.").

     **B.** **Plaintiffs have failed to show good cause as to why they should be granted leave to file the Proposed Amended Complaint since the proposed allegations are insufficient to establish a claim under the Sherman Antitrust Act.**

     In Count Four of the Proposed Amended Complaint, Plaintiffs assert for the first time

that JPMorgan is liable under Section 2 of the Sherman Antitrust Act.[5] (Am. Compl. ¶¶ 211-

214.) To state a Section 2 monopolization claim, plaintiffs must allege facts showing "(1) the

possession of monopoly power in the relevant market and (2) the willful acquisition or

maintenance of that power as distinguished from growth or development as a consequence of a

superior product, business, acumen, or historic accident." United States v. Grinell Corp., 384

U.S. 563, 570-71 (1966). "Monopoly power" has been held to exist where a party "can control

prices or exclude competition." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 107-08 (2d Cir.

2002). The "willful acquisition or maintenance of power" has been construed as "improper

conduct that has or is likely to have the effect of controlling prices or excluding competition."

Id. at 108.

     Here, Plaintiffs have not alleged any factual allegations or authority to support their

conclusion that JPMorgan either had monopoly power in the COMEX market or engaged in the

---

[5]Plaintiffs do not add any allegations in their Proposed Amended Complaint that might cause the Court to reconsider its previous decision to dismiss Plaintiffs' Section 1 claims, and thus the Court sees no grounds to do so. As was made clear in the Opinion, Plaintiffs failed to state a Section 1 claim because they relied on conclusory statements to show the existence of a conspiracy by JPMorgan to restrain trade or manipulate the COMEX silver futures markets. (Op. at 36); see also Harris, 572 F.3d at 72 ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that 'tenet' is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks and citations omitted).

willful acquisition of such monopoly power.[6]  Indeed the factual allegations upon which

Plaintiffs rely, (<u>see</u> Pls. Mem. at 10 (citing Am. Compl. ¶¶ 4-7, 52, 56-67, 211-19),  simply do

not explain how JPMorgan might have acted to control prices or to exclude other silver futures

traders in the COMEX silver market, (<u>see</u> <u>supra</u> at IV.A) (discussing insufficiency of Plaintiffs'

pleadings).  Nor do Plaintiffs' factual allegations make it clear that the apparently legitimate

transactions which JPMorgan is alleged to have made on the COMEX silver futures market were

made for illegitimate or anticompetitive reasons, i.e., an abuse of monopoly power.

Plaintiffs also have failed to explain why they should be entitled to add this Section 2

Claim at this late stage in the litigation, and this Court therefore declines to grant them leave to

do so now.  <u>See</u> <u>In re Merrill Lynch & Co., Inc.</u>, 273 F. Supp. 2d 351, 391 (S.D.N.Y. 2003)

(leave to amend is properly denied when, inter alia, Plaintiffs wait until dismissal of their claims

before requesting leave to amend), <u>aff'd</u>, <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161 (2d

Cir.2005); <u>see also</u> <u>Berman v. Parco</u>, 986 F. Supp. 195, 217 (S.D.N.Y. 1997) ("[T]he Court may

deny a motion to amend when the movant knew or should have known of the facts upon which

the amendment is based when the original pleading was filed, particularly when the movant

offers no excuse for the delay.") (internal quotation marks omitted).  For as other courts in this

district have held, leave to amend a complaint should generally be denied when a motion to

amend is "filed solely in an attempt to prevent the Court from granting a motion to dismiss or for

---

[6]In support of their Sherman Antitrust Act claim, Plaintiffs allege that JPMorgan frequently held 24-32% of the open
interest in <u>all</u> COMEX silver futures short contracts then trading" and that "JPMorgan also sometimes held 30-40%
of the short open interest in the important COMEX silver futures contracts expiring in the 'front' months."  (Am.
Compl. ¶ 3.)  These allegations do not make clear what relative stake in the silver futures market JPMorgan held as
compared to other silver futures traders and, even if they did, the Second Circuit has long stated, that this percentage
of a market does not necessarily constitute a monopoly.  <u>See</u> <u>United States v. Aluminum Co. of Am.</u>, 148 F.2d 416,
424 (2d Cir. 1945) ("[Ninety percent of a market] is enough to constitute a monopoly; it is doubtful whether sixty . .
. percent would be enough; and certainly thirty-three percent is not.").

summary judgment, particularly when the new claim could have been raised earlier." Berman,

986 F. Supp. at 217; see also Goss v. Revlon, 548 F.2d 405, 407 (2d Cir. 1976).

### C. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to File an Amended Consolidated Class

Action Complaint is DENIED and the action is dismissed.

SO ORDERED.

Dated:  New York, New York
          March 15, 2013

_____s/s_____
                   Robert P. Patterson
                   U.S.D.J.

**SPA-54**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _3/25/13_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
IN RE  COMMODITY EXCHANGE, INC.,
SILVERS FUTURES AND OPTIONS
TRADING LITIGATION
-------------------------------------------------------------X

11 **MD** 2213 (RPP)

**JUDGMENT**

     Whereas in an Opinion and Order dated December 21, 2012, the Court having granted

Defendants' motion to dismiss; the Court having gave Plaintiffs thirty days to show why leave to

replead is necessary and the Court also having denied Plaintiffs' motion to compel limited

discovery; on January 22, 2013, Plaintiffs having filed a Motion for Leave to File an Amended

Consolidated Class Action Complaint, and the matter having come before the Honorable Robert P.

Patterson, Jr., United States District Judge, and the Court, on March 15, 2013, having rendered its

Opinion and Order denying Plaintiffs' Motion to File an Amended Consolidated Class Action

Complaint and dismissing the action, it is,

     **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated March 15, 2013, Plaintiffs' Motion to File an Amended

Consolidated Class Action Complaint is denied and the action is dismissed.

**Dated:** New York, New York
       March 25, 2013

                  **RUBY J. KRAJICK**

                  **Clerk of Court**

        BY:

                  **Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____